AURIGA CAPITAL CORPORATION, a Delaware corporation, Paul Rooney, Hakan Sokmenseur, Don Kyle, Ivan Benjamin and Glenn Morse, Plaintiffs,

v.

GATZ PROPERTIES, LLC, a Delaware limited liability company, and William A. Gatz, Defendants.

No. C.A. 4390–CS.

Court of Chancery of Delaware.

Submitted: Dec. 21, 2011.
Decided: Jan. 27, 2012.

John L. Reed, Esquire, R. Craig Martin, Esquire, K. Tyler O'Connell, Esquire, DLA Piper LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Steven L. Caponi, Esquire, Elizabeth A. Sloan, Esquire, Blank Rome LLP, Wilmington, Delaware; Collins J. Seitz, Jr., Esquire, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware, Attorneys for Defendants.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

The manager of an LLC and his family acquired majority voting control over both classes of the LLC's equity during the course of its operations and thereby held a veto over any strategic option. The LLC was an unusual one that held a long-term lease on a valuable property owned by the manager and his family. The leasehold allowed the LLC to operate a golf course on the property.

The LLC intended to act as a passive operator by subleasing the golf course for operation by a large golf management corporation. A lucrative sublease to that effect was entered in 1998. The golf management corporation, however, was purchased early in the term of the sublease

by owners that sought to consolidate its operations. Rather than invest in the leased property and put its full effort into making the course a success, the management corporation took short cuts, let maintenance slip, and evidenced a disinterest in the property. By as early as 2004, it was clear to the manager that the golf management corporation would not renew its lease.

This did not make the manager upset. The LLC and its investors had invested heavily in the property, building on it a first-rate Robert Trent Jones, Jr.—designed golf course and a clubhouse. If the manager and his family could get rid of the investors in the LLC, they would have an improved property, which they had reason to believe could be more valuable as a residential community. Knowing that the golf management corporation would likely not renew its sublease, the manager failed to take any steps at all to find a new strategic option for the LLC that would protect the LLC's investors. Thus, the manager did not search for a replacement management corporation, explore whether the LLC itself could manage the golf course profitably, or undertake to search for a buyer for the LLC. Indeed, when a credible buyer for the LLC came forward on its own and expressed a serious interest, the manager failed to provide that buyer with the due diligence that a motivated seller would typically provide to a possible buyer. Even worse, the manager did all it could to discourage a good bid, frustrating and misleading the interested buyer.

The manager then sought to exploit the opportunity provided by the buyer's emergence to make low-ball bids to the other investors in the LLC on the basis of materially misleading information. Among other failures, the manager made an offer at $5.6 million for the LLC without telling the investors that the buyer had expressed a willingness to discuss a price north of $6 million. The minority investors refused the manager's offer. When the minority investors asked the manager to go back and negotiate a higher price with the potential buyer, the manager refused.

This refusal reflected the reality that the manager and his family were never willing to sell the LLC. Nor did they desire to find a strategic option for the LLC that would allow it to operate profitably for the benefit of the minority investors. The manager and his family wanted to be rid of the minority investors, whom they had come to regard as troublesome bothers.

Using the coming expiration of the golf management corporation's sublease as leverage, the manager eventually conducted a sham auction to sell the LLC. The auction had all the look and feel of a distress sale, but without any of the cheap nostalgic charm of the old unclaimed freight tv commercials. Ridiculous postage stamp-sized ads were published and unsolicited junk mail was sent out. Absent was any serious marketing to a targeted group of golf course operators by a responsible, mature, respected broker on the basis of solid due diligence materials. No effort was made to provide interested buyers with a basis to assume the existing debt position of the LLC if they met certain borrower responsibility criteria. Instead, interested buyers were told that they would have to secure the bank's consent but were given an unrealistic amount of time to do so. Worst of all, interested buyers could take no comfort in the fact that the manager—who controlled the majority of the voting power of the LLC—was committed to selling the LLC to the highest bidder, as the bidding materials made clear that the manager was also planning to bid and at the same time re-

served the right to cancel the auction for any reason.

When the results of this incompetent marketing process were known and the auctioneer knew that no one other than the manager was going to bid, the auctioneer told the manager that fact. The manager then won with a bid of $50,000 in excess of the LLC's debt, on which the manager was already a guarantor. Only $22,777 of the bid went to the minority investors. For his services in running this ineffective process, the auctioneer received a fee of $80,000, which was greater than the cash component of the winning bid. Despite now claiming that the LLC could not run a golf course profitably and pay off the mortgage on the property, the manager has run the course himself since the auction and is paying the debt.

A group of minority investors have sued for damages, arguing the manager breached his contractual and fiduciary duties through this course of conduct. The manager, after originally disclaiming that he owed a fiduciary duty of loyalty to the minority, now rests his defense on two primary grounds. The first is that the manager and his family were able to veto any option for the LLC as their right as members. As a result, they could properly use a chokehold over the LLC to pursue their own interests and the minority would have to live with the consequences of their freedom of action. The second defense is that by the time of the auction, the LLC was valueless.

In this post-trial decision, I find for the plaintiffs. For reasons discussed in the opinion, I explain that the LLC agreement here does not displace the traditional duties of loyalty and care that are owed by managers of Delaware LLCs to their investors in the absence of a contractual provision waiving or modifying those duties. The Delaware Limited Liability Company Act (the "LLC Act") explicitly applies equity as a default[1] and our Supreme Court, and this court, have consistently held that default fiduciary duties apply to those managers of alternative entities who would qualify as fiduciaries under traditional equitable principles, including managers of LLCs. Here, the LLC agreement makes clear that the manager could only enter into a self-dealing transaction, such as its purchase of the LLC, if it proves that the terms were fair. In other words, the LLC agreement essentially incorporates a core element of the traditional fiduciary duty of loyalty. Not only that, the LLC agreement's exculpatory provision makes clear that the manager is not exculpated for bad faith action, willful misconduct, or even grossly negligent action, i.e., a breach of the duty of care.

The manager's course of conduct here breaches both his contractual and fiduciary duties. Using his control over the LLC, the manager took steps to deliver the LLC to himself and his family on unfair terms. When the LLC had a good cushion of cash from the remaining years of the lease, it was in a good position to take the time needed to responsibly identify another strategic option to generate value for the LLC and all of its investors. Although the economy was weakening, the golf course was well-designed and located in a community that is a good one for the profitable operation of a golf course. With a minimally competent and loyal fiduciary at the helm, the LLC could have charted a course that would have delivered real value to its investors. Had the manager acted properly, for example, the buyer he rebuffed could have entered into a new lease or purchased the LLC on terms that would have at least gotten the LLC's mi-

---

1. 6 *Del. C.* § 18–1104.

nority investors back what they had put in and some modest return.

The manager himself is the one who has created evidentiary doubt about the LLC's value by failing to pursue any strategic option for the LLC in a timely fashion because he wished to squeeze out the minority investors. The manager's defense that his voting power gave him a license to exploit the minority fundamentally misunderstands Delaware law. The manager was free not to vote his membership interest for a sale. But he was not free to create a situation of distress by failing to cause the LLC to explore its market alternatives and then to buy the LLC for a nominal price. The purpose of the duty of loyalty is in large measure to prevent the exploitation by a fiduciary of his self-interest to the disadvantage of the minority. The fair price requirement of that duty, which is incorporated in the LLC agreement here, makes sure that if the conflicted fiduciary engages in self-dealing, he pays a price that is as much as an arms-length purchaser would pay.

The manager is in no position to take refuge in uncertainties he himself created by his own breaches of duty. He himself is responsible for the distress sale conducted in 2009. Had he acted properly, the LLC could have secured a strategic alternative in 2007, when it was in a stronger position and the economy was too. A transaction at that time would have likely yielded proceeds for the minority of a return of their invested capital plus a 10% total return, an amount which reflects the reality that the manager's desire to retain control of the LLC would have pushed up the pricing of the transaction due to his incentive to top any third-party bidder. I therefore enter a remedy to that effect, taking into account the distribution received by the plaintiffs at the auction, and add interest, compounded monthly at the legal rate, from that time period. Because the manager has made this litigation far more cumbersome and inefficient than it should have been by advancing certain frivolous arguments, I award the plaintiffs one-half of their reasonable attorneys' fees and costs. This award is justified under the bad faith exception to the American Rule, and also ensures that the disloyal manager is not rewarded for making it unduly expensive for the minority investors to pursue their legitimate claims to redress his serious infidelity. I do not award full-fee shifting because I have not adopted all of the plaintiffs' arguments and because the manager's litigation conduct, while sanctionably disappointing, was not so egregious as to justify that result.

## II. Basic Factual Background

For the sake of clarity, I will make many of the key factual determinations in the course of analyzing the claims. To provide a framework for that integrated analysis, I set forth some of the key foundational facts.

### A. The Parties

The LLC in this case is Peconic Bay, LLC ("Peconic Bay" or the "Company"). The "Manager" of Peconic Bay is defendant Gatz Properties, LLC, an entity which is itself managed, controlled, and partially owned by defendant William Gatz. Because William Gatz as a person was the sole actor on behalf of Gatz Properties at all times, I typically refer to "his" actions or "him," because that is what best tracks how things happened.

The plaintiffs in this case are certain minority investors in Peconic Bay: Auriga Capital Corporation, Paul Rooney, Hakan Sokmenseur, Don Kyle, Ivan Benjamin,

and Glenn Morse.[2] William Carr is the founder and principal of Auriga, which encouraged the other plaintiffs to invest in Peconic Bay.[3] For the sake of clarity, I typically refer to the plaintiffs as the "Minority Members."

### B. *The Formation Of Peconic Bay*

In 1997, Gatz, through Gatz Properties, and Carr, through Auriga, formed Peconic Bay for the purpose of holding a long-term leasehold in a property owned by the Gatz family (the "Property"). The idea was to develop a golf course on the Property, which was farmland in Long Island that had been in the Gatz family since the 1950s. Gatz came to this idea from reading a report authored by the National Golf Foundation predicting a boom in demand for golf courses in Long Island and opining that the area suffered a shortage of courses to meet current and future demand. He thus set out to raise cash for the construction of a golf course on the Property, and approached a local bank to gauge its interest in financing the project. The bank then referred Gatz to Carr, who had worked with the bank on a previous occasion to secure the financing for another golf course in Long Island. On this advice, Gatz reached out to Carr, and Carr agreed to commit Auriga to help finance and develop the course. Auriga agreed to assume responsibility for securing debt financing and raising additional equity, as well as overseeing the construction of the course, which would be named Long Island National Golf Course (the "Course").

Financing was located and contracts were drafted to create the structures that would reflect the parties' business dealings, including an entity—*i.e.*, Peconic Bay—in which the equity investors could hold capital. Peconic Bay took out a note worth approximately $6 million to finance the Course's construction (the "Note"), which was collateralized by the Property. The Gatz family formed Gatz Properties to hold title to the Property, which was then leased to Peconic Bay under a "Ground Lease," dated January 1, 1998.[4]

The Ground Lease set an initial term of 40 years, with a renewal option for two 10-year extensions, which were exercisable by Peconic Bay.[5] The terms of the Ground Lease also restricted the Property's use to a high-end daily fee public golf course.[6] Thus, absent an agreement between Peconic Bay and the Gatz family, the Property was to be locked up for use by Peconic Bay as a golf course until 2038.

### C. *Peconic Bay's Membership*

Peconic Bay in turn was governed by an Amended and Restated Limited Liability Company Agreement (the "LLC Agree-

---

2. There is one minority investor, Bill Hartnett, who is not a party to this dispute. Two additional minority investors, Robert Trent Jones, Jr. and Greenscape, Ltd., are not parties to this dispute but have assigned their litigation interests to Auriga. For the sake of clarity, I treat the plaintiffs as having acquired the membership interests of Jones and Greenscape.

3. Carr is not a party to this dispute in his individual capacity but has been the key coordinating force for Auriga and the other plaintiffs.

4. JX–1 (Lease Agreement between Gatz Properties and Peconic Bay (January 1, 1998)).

5. JX–1 at §§ 1, 11(a).

6. JX–1 § 20.01. A high-end daily fee public golf course is one that is open to the public, and that derives a substantial portion of its revenue from charging a fee per round of golf played, and from food and beverage income. By contrast, a private golf course is one that derives a significant portion of its revenue from monthly or yearly membership fees, and it usually charges less per round of golf played.

ment").[7] The LLC Agreement created Class A and Class B membership interests. The Class A interests comprised 86.75% of Peconic Bay's membership, and the Class B, 13.25%.

From the inception, Gatz Properties controlled the Class A vote, as it held 85.07% of the Class A interests. The rest of the Class A interests were held by Auriga and Paul Rooney.

From the time the Class B shares were first issued in 1998 until 2001, the Class B interests were more diversely held. The Gatz family and their affiliates (together with Gatz Properties, the "Gatz Members") held 39.6% of the Class B interests. The Minority Members, including non-party Hartnett, held 60.3%. But, in 2001, the Gatz Members acquired control of the Class B interests through questionable purchases of certain minority investors' Class B shares.[8]

Obtaining control of the Class B interests was important. Under the LLC Agreement, the Manager was forbidden from making a "major decision affecting the Company" without "Majority Approval,"[9] which was defined as the vote of 66 2/3% of the Class A interests and 51% of the Class B interests.[10] Thus, control of the Class A and Class B interests gave the Gatz Members veto power over many of Peconic Bay's key strategic options, including, most relevantly, the decision to sell the Company;[11] enter into a long-term sublease with a golf course operator;[12] or "otherwise deal with the [Course] in such manner as may be determined by Majority Approval of the Members,"[13] such as choosing to run the Course itself. The Gatz Members' interests in Peconic Bay were aligned and they voted their membership units as a bloc at all relevant times in this dispute.

The LLC Agreement designated Gatz Properties as Manager. Gatz, as manager of Gatz Properties, was given the "power, on behalf of [Peconic Bay], to do all things necessary or convenient to carry out the day-to-day operation of the Company."[14] But, the role of the Manager was intended to be a limited, albeit important, one, and Gatz received no management fee in connection with his services as a reflection of this understanding. The Gatzes were instead to be compensated in two other ways: (1) through their interests as members of Peconic Bay; and (2) through rent for the Property.

The Manager's limited operational role was attributable to Peconic Bay's initial business model. Under the LLC Agreement, Peconic Bay was initially structured as a passive "black box"[15] entity that would be a conduit for cash flows rather than actually operate the course itself. The Course was instead to be run and managed by a third-party operator. The Manager would then collect rent from that

---

7. JX–2 (Amended and Restated Limited Liability Company Agreement (January 1, 1998)).

8. The transfers increased the Gatz Members' ownership to 52.8% of the Class B interests. Earlier in this litigation, Auriga challenged the validity of these share purchases under § 17 of the LLC Agreement, which governed transfers of interest. The Minority Members did not pursue this claim later in the litigation, perhaps realizing that they had not raised a challenge to the 2001 transfers in a timely manner. See Ps. Mot. to Dismiss Defs. Countercl. at 11–15.

9. JX–2 § 7(c).

10. Id. § 8(c).

11. Id. § 7(c)(vii).

12. Id. § 7(c)(v).

13. Id. § 4.

14. Id. § 7.

15. Tr. 10 (Carr).

operator, make Peconic Bay's required debt payments on the Note, and then distribute the remaining cash surplus to the investors according to a distribution scheme set forth in the LLC Agreement, which called for payment of 95% of all cash distributions to go to the Class B members until they received a full return of their investment. After that point, the distributions were to be made pro rata.[16]

### D. *Peconic Bay Subleases The Property To American Golf*

To accomplish this business purpose, Carr brought in American Golf Corporation ("American Golf"), which was at the time one of the largest golf course operators in the country. On March 31, 1998, Peconic Bay entered into a sublease with American Golf (the "Sublease").[17] The Sublease was for a term of 35 years, but it gave American Golf an early termination right after the tenth full year of operation. American Golf could terminate the Sublease at its discretion and without penalty by notifying Peconic Bay within 30 days of January 1, 2010.

Peconic Bay and American Golf had high expectations for the Course's financial success. The Course was designed by a well-known golf course architect, Robert Trent Jones, Jr., and it was located in an affluent, rural part of Long Island that was described by Gatz's defense expert as "an ideal location for an affordable upscale golf facility." [18]

The terms of the Sublease governing rent payments reflected this initial optimism. American Golf agreed to pay "Minimum Rent" according to a fixed schedule, starting at $700,000, and rising annually by $100,000 until leveling out at $1 million per year, beginning in 2003.[19] In addition to Minimum Rent, American Golf had to pay "Ground Lease Rent" equal to 5% of its revenue from operations. Although this rent would be payable to Peconic Bay, it would pass directly through to Gatz Properties as rent under the Ground Lease between Peconic Bay and Gatz Properties.[20]

### E. *A Preview Of What Happened Next*

This is where events took a turn for the worse. As I will discuss in more detail later, American Golf never operated the Course at a profit, and later let the Course fall into disrepair. Gatz knew in 2004 or latest 2005 that American Golf would exercise its early termination option in 2010, yet he did nothing to plan for American Golf's exit. Rather, Gatz made a series of decisions that placed Peconic Bay in an economically vulnerable position. Once Peconic Bay was in this vulnerable state, and in the midst of a down economy, Gatz decided to put Peconic Bay on the auction block without engaging a broker to market Peconic Bay to golf course managers or owners (the "Auction"). Gatz, on behalf of Gatz Properties, was the only bidder to show up. Knowing this fact before formulating his bid, Gatz purchased Peconic Bay for a nominal value over the debt, and merged Peconic Bay into Gatz Properties (the "Merger"). Gatz now operates the Course himself through a newly created entity wholly owned by Gatz Properties and seems to be paying the debt from the cash flow of the golf course operations.

---

16. *See* JX–2 § 11.

17. JX–4 (Lease between Peconic Bay and American Golf (March 31, 1998)).

18. JX–99 (Summary Appraisal Report by Laurence A. Hirsh (September 23, 2008)) at PBG0001514.

19. JX–4 § 6.1.

20. *Id.* § 6.4; JX–1 § 3(b).

### III. *The Parties' Contentions*

The first amended verified complaint pleads five counts. Counts I, II and III are related. Counts I and II allege that Gatz Properties and Gatz, respectively, breached their fiduciary duties to Peconic Bay and the Minority Members. Count III alleges that Gatz Properties breached its contractual duties under the LLC Agreement.[21] These three counts center on the squeeze out of the Minority Members. Specifically, the Minority Members claim that Gatz breached the fiduciary duties and contractual duties owed to Peconic Bay's Minority Members by engaging in a "protracted course of self-interested conduct conceived and implemented in bad faith" for the purpose of eliminating the Minority Members' interest.[22] The Minority Members contend that Gatz was motivated to oust the Minority Members in order to realize the upside in value that would result from eliminating Peconic Bay's long-term leasehold interest in the Property. Such actions include Gatz's failure to take any steps to evaluate strategic options for Peconic Bay based on known business realities and his discouragement of a potential third-party buyer for the Company, which entertained a willingness to make an offer that would have delivered to the Minority Members a full return of their capital investment. What's more, the Minority Members continue, Gatz used the leverage obtained from his own bad faith breaches of loyalty to make coercive buyout offers to the Minority Members, and finally to acquire Peconic Bay through a sham auction process at an unfairly low price.[23]

For his part, Gatz maintains that he acted reasonably and in good faith throughout the entirety of events described by the Minority Members. Primarily, Gatz grounds his defense in the argument that Gatz Properties acquired Peconic Bay for a fair price because the assets of Peconic Bay were worth less than its debt and thus the entity was insolvent. Although by the end of the trial, Gatz admitted that he and his family were never interested in selling their membership interests, he seeks to use that fact as a defensive bulwark, contending that he and his family were entitled to vote their economic interest against selling Peconic Bay to a third-party buyer and to choke off the LLC's pursuit of any other strategic options. Throughout much of the litigation, Gatz took the view that he either owed no fiduciary duties at all;[24] that if these duties existed, they allowed him to engage in a self-dealing transaction subject only to a hands-off business judgment rule review,[25] and that even if a more intensive review applied, Gatz ran a thorough, professional auction upon credible independent advice, thus satisfying any fairness burden.[26] As these arguments emerged at trial as having no genuine basis in law or

---

21. Compl. ¶¶ 53–58 (Count I); *id.* at ¶¶ 59–63 (Count II); *id.* at ¶¶ 64–70 (Count III). Also, Count IV alleges that Gatz Properties breached the implied covenant of good faith and fair dealing under the LLC Agreement, and Count V alleges that Gatz aided and abetted Gatz Properties' breach of fiduciary duty to the extent that Gatz does not owe such duties directly. *Id.* at ¶¶ 71–76 (Count IV); *id.* at ¶¶ 77–81 (Count V).

22. *Id.* ¶ 56.

23. In addition to these central counts, the Minority Members bring claims related to Gatz's alleged failure to distribute funds as "Available Cash" under § 11 of the LLC Agreement. *E.g., id.* ¶ 68 (Count III), ¶ 74 (Count IV).

24. *E.g.,* Defs. Ans. Br. in Opp'n to P. Mot. for Prelim. Injunction, at 20–22 (arguing that the LLC Agreement waived all fiduciary duties).

25. *E.g.,* Defs. Op. Pre–Tr. Br. at 9.

26. *E.g., id.* at 26–29; Defs. Ans. Pre–Tr. Br. at 9–11.

fact, Gatz became more nuanced and has focused on other arguments. Finally, Gatz says, even if his actions did constitute a breach of his fiduciary duties, his actions were supposedly taken in good faith and with due care, and thus he cannot be held liable due to the terms of the exculpation clause of the LLC Agreement.

Now that we have covered the basic premise of the Minority Members' claims and Gatz's arguments in response, I will consider the provisions of the LLC Agreement that govern Gatz's actions giving rise to this dispute, and assess the effect that those provisions have on the fiduciary duties owed by Gatz to the Minority Members.

## IV. Analysis

### A. What Duties Did Gatz Owe To The Members Of Peconic Bay?

At points in this litigation, Gatz has argued that his actions were not subject to any fiduciary duty analysis because the LLC Agreement of Peconic Bay displaced any role for the use of equitable principles in constraining the LLC's Manager. As I next explain, that is not true.

■ The Delaware LLC Act starts with the explicit premise that "equity" governs any case not explicitly covered by the Act.[27] But the Act lets contracting parties modify or even eliminate any equitable fiduciary duties, a more expansive construction than is allowed in the case of corporations.[28] For that reason, in the LLC context, it is typically the case that the evaluation of fiduciary duty claims cannot occur without a close examination of the LLC agreement itself, which often tailors the traditional fiduciary duties to address the specific relationship of the contracting parties.[29]

I discuss these general principles and their more specific application to this case next.

### 1. Default Fiduciary Duties Do Exist In The LLC Context

■ The Delaware LLC Act does not plainly state that the traditional fiduciary duties of loyalty and care apply by default as to managers or members of a limited liability company. In that respect, of course, the LLC Act is not different than the DGCL, which does not do that either. In fact, the absence of explicitness in the DGCL inspired the case of *Schnell v. Chris–Craft*.[30] Arguing that the then newly-revised DGCL was a domain unto itself, and that compliance with its terms was sufficient to discharge any obligation owed by the directors to the stockholders, the defendant corporation in that case won on that theory at the Court of Chancery level.[31] But our Supreme Court reversed and made emphatic that the new DGCL was to be read in concert with equitable fiduciary duties just as had always been the case, stating famously that "inequitable action does not become legally permissible simply because it is legally possible."[32]

The LLC Act is more explicit than the DGCL in making the equitable overlay mandatory. Specifically, § 18–1104 of the LLC Act provides that "[i]n any case not provided for in this chapter, *the rules of law and equity ... shall govern.*"[33] In

27. See 6 Del. C. § 18–1104.

28. Compare 6 Del. C. § 18–1101(c), with 8 Del. C. § 102(b)(7).

29. See, e.g., Douzinas v. Am. Bureau of Shipping, Inc., 888 A.2d 1146, 1149–50 (Del.Ch. 2006).

30. Schnell v. Chris–Craft Indus., Inc., 285 A.2d 437 (Del.1971).

31. Schnell v. Chris–Craft Indus., Inc., 285 A.2d 430, 437 (Del.Ch.1971).

32. Schnell, 285 A.2d at 439 (Del.1971).

33. 6 Del. C. § 18–1104 (emphasis added).

this way, the LLC Act provides for a construct similar to that which is used in the corporate context. But unlike in the corporate context, the rules of equity apply in the LLC context *by statutory mandate,* creating an even stronger justification for application of fiduciary duties grounded in equity to managers of LLCs to the extent that such duties have not been altered or eliminated under the relevant LLC agreement.[34]

It seems obvious that, under traditional principles of equity, a manager of an LLC would qualify as a fiduciary of that LLC and its members. Under Delaware law, "[a] fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." [35] Corporate directors, general partners and trustees are analogous examples of those who Delaware law has determined owe a "special duty." [36] Equity distinguishes fiduciary relationships from straightforward commercial arrangements where there is no expectation that one party will act in the interests of the other.[37]

The manager of an LLC—which is in plain words a limited liability "company" having many of the features of a corporation—easily fits the definition of a fiduciary. The manager of an LLC has more

**34.** Section 18–1101(c) of the LLC Act provides: *"To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties )* to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a[n][LLC] agreement, *the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the [LLC] agreement;* provided, that the [LLC] agreement may not eliminate the implied covenant of good faith and fair dealing." 6 *Del. C.* § 18–1101(c) (emphasis added). Although § 18–1101(c) allows parties to an LLC agreement to contract out of owing fiduciary duties to one another, the fact that these duties can be contractually avoided suggests that they exist by default in the first place. When read together, the most logical reading of § 18–1104 and § 18–1101(c) that results is that if, *i.e.,* "to the extent that," equity would traditionally make a manager or member a fiduciary owing fiduciary duties, then that manager or member *is* a fiduciary, subject to the express right of the parties to contract out of those duties. By contrast, if a member or manager would not be considered a fiduciary owing circumstantially-relevant duties under traditional equitable principles, then the member or manager is immune from fiduciary liability, not because of the statute, but because equity itself would not consider the member or manager to have case-relevant fiduciary duties. The "to the extent that" language makes clear that the statute does not itself impose some broader scope of fiduciary coverage than traditional principles of equity.

**35.** *Metro Ambulance, Inc. v. E. Med. Billing, Inc.,* 1995 WL 409015, at *2 (Del.Ch. July 5, 1995) (citing *Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del.Ch.1973), *rev'd on other grounds,* 311 A.2d 870 (Del.1973)); *see also Lank v. Steiner,* 213 A.2d 848, 852 (Del. Ch.1965), *aff'd,* 224 A.2d 242 (Del.1966); *In re USACafes, L.P. Litig.,* 600 A.2d 43, 48 (Del. Ch.1991).

**36.** *See Metro Ambulance,* 1995 WL 409015, at *3; *McMahon v. New Castle Assocs.,* 532 A.2d 601, 604–05 (Del.Ch.1987).

**37.** *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 114 (Del.2006) (agreeing with the court below that "it is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships ...") (citation omitted); *McMahon,* 532 A.2d at 605 (relationship between landlord and tenant was wholly contractual and not fiduciary); *Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II LLC,* 2005 WL 1364616, at *6 (Del.Ch. May 27, 2005) (real estate investment contract between Prestancia and the defendant "was a bargained-for commercial relationship between sophisticated parties ... that [did] not give rise to fiduciary duties."); *Metro Ambulance,* 1995 WL 409015, at *2–3 (relationship established by two commercial contracts was not fiduciary).

than an arms-length, contractual relationship with the members of the LLC.[38] Rather, the manager is vested with discretionary power to manage the business of the LLC.[39]

Thus, because the LLC Act provides for principles of equity to apply, because LLC managers are clearly fiduciaries, and because fiduciaries owe the fiduciary duties of loyalty and care, the LLC Act starts with the default that managers of LLCs owe enforceable fiduciary duties.

This reading of the LLC Act is confirmed by the Act's own history. Before 2004, § 18–1101(c) of the LLC Act provided that fiduciary duties, to the extent they existed, could only be "expanded or restricted" by the LLC agreement.[40] Following our Supreme Court's holding in *Gotham Partners*,[41] which questioned whether default fiduciary duties could be fully eliminated in the limited partnership context when faced with similar statutory language and also affirmed our law's commitment to protecting investors who have not explicitly agreed to waive their fiduciaries' duties and therefore expect their fiduciaries to act in accordance with their interests,[42] the General Assembly amended not only the Delaware Revised Limited Uniform Partnership Act ("DRULPA"),[43] but also the LLC Act to permit the "eliminat[ion]" of default fiduciary duties in an LLC agreement.[44] At the same time, the General Assembly added a provision to the LLC Act (the current § 18–1101(e)) that permits full contractual exculpation for breaches of fiduciary and contractual duties, except for the implied contractual covenant of good faith and fair dealing.[45]

If the equity backdrop I just discussed did not apply to LLCs, then the 2004 "Elimination Amendment" would have been logically done differently. Why is this so? Because the Amendment would have instead said something like: "The managers, members, and other persons of the LLC shall owe no duties of any kind to the LLC and its members except as set forth in this statute and the LLC agreement."[46] Instead, the Amendment only

---

**38.** See *Grace v. Morgan*, 2004 WL 26858, at *2 (Del.Super. Jan. 6, 2004) (concluding that the manager of an LLC "had more than an arms-length, commercial relationship" with the LLC's member when that member "placed a very particular and special trust in [the manager] in her position as [manager] to find and hire a competent architectural and engineering firm, to contribute meaningfully to the project plans, to oversee the planning and construction, and to ensure that goals as well as codes and specifications were met."); *see also Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *22 (Del.Ch. Mar. 13, 2000) (analyzing whether to impose fiduciary duties on limited partners who did not manage the business based on traditional fiduciary criteria, and finding that they did owe a duty based on the circumstances of the limited partnership's business).

**39.** See *6 Del. C.* § 18–402. In this regard, managers of an LLC bear resemblance to directors of a corporation, who are charged with managing "the business and affairs" of the corporation. *8 Del. C.* § 141(a).

**40.** *6 Del. C.* § 18–1101(c) (2003).

**41.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160 (Del.2002).

**42.** *Id.* at 168 ("[W]e note the historic cautionary approach of the courts of Delaware that efforts by a fiduciary to escape a fiduciary duty, whether by a corporate director or officer or other type of trustee, should be scrutinized searchingly.") (citing cases).

**43.** 74 Del. Laws ch. 265, § 15 (2004).

**44.** 74 Del. Laws ch. 275, § 13 (2004).

**45.** *Id.* § 14; *see also id.* at ch. 265, § 16 (amending DRULPA in same way).

**46.** An agreement containing a provision with this language was analyzed in *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156 (Del.Ch. May 7, 2008), and the court found it to waive all fiduciary duties except those that were contractually provided for. *Id.* at *9 (where the provision stated: "No Member shall have any

made clear that an LLC agreement could, if the parties so chose, "eliminat[e]" default duties altogether, thus according full weight to the statutory policy in favor of giving "maximum effect to the principle of freedom of contract and to the enforceability of [LLC] agreements."[47] The General Assembly left in place the explicit equitable default in § 18–1104 of the Act. Moreover, why would the General Assembly amend the LLC Act to provide for the elimination of (and the exculpation for) "something" if there were no "something" to eliminate (or exculpate) in the first place?[48] The fact that the legislature enacted these liability-limiting measures against the backdrop of case law holding that default fiduciary duties did apply in the LLC context, and seemed to have accepted the central thrust of those decisions to be correct, provides further weight to the position that default fiduciary duties do apply in the LLC context to the extent they are not contractually altered.[49]

■■■ Thus, our cases have to date come to the following place based on the statute. The statute incorporates equitable principles. Those principles view the manager of an LLC as a fiduciary and subject the manager as a default principle to the core fiduciary duties of loyalty and care. But, the statute allows the parties to an LLC agreement to entirely supplant those default principles or to modify them in part.[50] Where the parties have clearly supplanted default principles in full, we give effect to the parties' contract choice.[51] Where the parties have clearly supplanted default principles in part, we give effect to their contract choice.[52] But, where the core default fiduciary duties have not been supplanted by contract, they exist as the LLC statute itself contemplates.[53]

duty to any Member of the Company except as expressly set forth herein or in other written agreements. . . .").

**47.** *6 Del. C.* § 18–1101(b).

**48.** *See Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883) (stating the basic principle of statutory interpretation that courts must "give effect, if possible, to every clause and word of a statute. . . .").

**49.** *Cf. Holder v. Hall,* 512 U.S. 874, 920, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) ("It is true that we generally will assume that reenactment of specific statutory language is intended to include a 'settled judicial interpretation' of that language.") (citing *Pierce v. Underwood,* 487 U.S. 552, 567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

**50.** *6 Del. C.* § 18–1101(c); *see also Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, at *8 (Del.Ch. Apr. 20, 2009); *Gerber v. Enter. Prods. Holdings, LLC,* 2012 WL 34442, at *13 (Del.Ch. Jan. 6, 2012) ("Alternate entity legislation reflects the Legislature's decision to allow such ventures to be governed without the traditional fiduciary duties, if that is what the . . . governing document provides for, and allows conduct that, in a different context, would be sanctioned.").

**51.** *See, e.g., In re Atlas Energy Res., LLC,* 2010 WL 4273122, at *12 (Del.Ch. Oct. 28, 2010); *Fisk Ventures,* 2008 WL 1961156, at *9.

**52.** *See, e.g., Related Westpac LLC v. JER Snowmass LLC,* 2010 WL 2929708, at *8 (Del.Ch. July 23, 2010) (when parties to a contract "cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default."). For cases addressing this principle in the limited partnership context, see generally *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 795 A.2d 1, 31 (Del.Ch.2001), *aff'd in relevant part,* 817 A.2d 160 (Del.2002); *Gelfman v. Weeden Investors, L.P.,* 792 A.2d 977, 987 (Del.Ch.2001); *Miller v. Am. Real Estate Partners, L.P.,* 2001 WL 1045643, at *8–9 (Del.Ch. Sept. 6, 2001).

**53.** From my experience as a trial judge, I note that few LLC agreements contain an express, general provision that states what fiduciary duties are owed in the first instance. Rather, the agreements assume that such fiduciary duties are owed, and then they proceed to cut

There are two issues that would arise if the equitable background explicitly contained in the statute were to be judicially excised now. The first is that those who crafted LLC agreements in reliance on equitable defaults that supply a predictable structure for assessing whether a business fiduciary has met his obligations to the entity and its investors will have their expectations disrupted. The equitable context in which the contract's specific terms were to be read will be eradicated, rendering the resulting terms shapeless and more uncertain. The fact that the implied covenant of good faith and fair dealing would remain extant would do little to cure this loss.

The common law fiduciary duties that were developed to address those who manage business entities were, as the implied covenant, an equitable gap-filler. If, rather than well thought out fiduciary duty principles, the implied covenant is to be used as the sole default principle of equity, then the risk is that the certainty of contract law itself will be undermined. The implied covenant has rightly been narrowly interpreted by our Supreme Court to apply only "when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue." [54] The implied covenant is to be used "cautious[ly]" and does not apply to situations that could be anticipated,[55] which is a real problem in the business context, because fiduciary duty review typically addresses actions that are anticipated and permissible under the express terms of the contract, but where there is a potential for managerial abuse.[56] For these reasons, the implied covenant is not a tool that is designed to provide a framework to govern the discretionary actions of business managers acting under a broad enabling framework like a barebones LLC agreement.[57] In fact, if the implied covenant were used in that manner, the room for subjective judicial oversight could be expanded in an inefficient

back on liability for breaches of those duties through exculpation provisions or through provisions that displace the traditional duties in favor of a contractual standard addressing specific types of transactions or conduct. *See, e.g., Kelly,* 2010 WL 629850, at *11–12; *Related Westpac,* 2010 WL 2929708, at *2.

**54.** *Nemec v. Shrader,* 991 A.2d 1120, 1127 n. 20 (Del.2010) (citing *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del.Ch. Nov. 10, 1998)); *see also Katz v. Oak Indus. Inc.,* 508 A.2d 873, 880 (Del.Ch.1986) (stating that the legal test for implying contractual obligations is whether it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter.").

**55.** *Nemec,* 991 A.2d at 1125 (citation omitted).

**56.** *Allied Capital Corp. v. GC–Sun Holdings,* 910 A.2d 1020, 1032–33 (Del.Ch.2006) ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."); *see also Related Westpac,* 2010 WL 2929708, at *6 (citing authority on this point); 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2002) ("As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.").

**57.** *See Airborne Health, Inc. v. Squid Soap, LP,* 984 A.2d 126, 146 (Del.Ch.2009) ("The [implied covenant] . . . operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small.").

way. The default principles that apply in the fiduciary duty context of business entities are carefully tailored to avoid judicial second-guessing.[58] A generalized "fairness" inquiry under the guise of an "implied covenant" review is an invitation to, at best, reinvent what already exists in another less candid guise,[59] or worse, to inject unpredictability into both entity and contract law, by untethering judicial review from the well-understood frameworks that traditionally apply in those domains.[60]

The second problem is a related one, which is that a judicial eradication of the explicit equity overlay in the LLC Act could tend to erode our state's credibility with investors in Delaware entities. To have told the investing public that the law of equity would apply if the LLC statute did not speak to the question at issue, and to have managers of LLCs easily qualify as fiduciaries under traditional and settled principles of equity law in Delaware, and then to say that LLC agreements could "expan[d] or restric[t] or eliminat[e]" these fiduciary duties, would lead any reasonable investor to conclude the following: the managers of the Delaware LLC in which I am investing owe me the fiduciary duties of loyalty and care except to the extent the agreement "expand[s]," "restrict[s]," or "eliminate[s]" these duties.[61] That expectation has been reinforced by our Supreme Court in decisions like *William Penn Partnership v. Saliba,* where it stated that "[t]he parties here agree that managers of a Delaware [LLC] owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in an operating agreement;"[62] in a consistent line of decisions by this court affirming similar principles;[63] in the reasoning of

58. *See generally* Stephen A. Radin, 1 *The Business Judgment Rule* 11–13 (6th ed.2009).

59. If, to put it in implied covenant terms, the expectation that an LLC manager will act loyally and with due care is "so fundamental that it is clear that the [parties] [would] not feel a need to negotiate about [it]," *Allied Capital,* 910 A.2d at 1032–33, isn't that another way of saying that the parties expected that the manager could only take contractually permissible (*i.e.,* legal) action if he acted in compliance with his fiduciary duties, *i.e.,* equitably? If we imply these equity duties in the guise of the contractual implied covenant, are we adding clarity or simply confusing things? I believe it would be the latter.

60. In Vice Chancellor Noble's well-reasoned decision in *Gerber v. Enterprise Products Holdings, LLC,* he explains convincingly why the concepts in the contractual term, the "implied covenant of good faith and fair dealing," do not have the same meaning as when the terms good faith or fair dealing are used in defining the duty of loyalty owed by a corporate fiduciary. 2012 WL 34442, at *11 n. 46 (Del.Ch. Jan. 6, 2012); *see also id.* at *13 n. 58. To broaden the carefully constrained, albeit still important, contractual covenant to act as an equitable constraint on the broad managerial authority that an LLC agreement might vest

in the manager would involve a transformation of its role that would seem to have little benefit (as it would involve judges reinventing an equitable overlay in the guise of contract rather than using one that has been carefully shaped by generations of experience) but great cost (as it would risk reducing the predictability of contract law by changing settled principles and entity law, by constraining the exercise of legal, *i.e.,* contractual and statutory, action by managers not to understood principles of equity, but by a novel deployment of an implied covenant).

61. 6 *Del. C.* § 18–1101(c).

62. *William Penn P'ship v. Saliba,* 13 A.3d 749, 756 (Del.2011) (citing *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, at *8 (Del.Ch. Apr. 20, 2009)).

63. *See Phillips v. Hove,* 2011 WL 4404034, at *24 (Del.Ch. Sept. 22, 2011); *In re Atlas Energy Res., LLC,* 2010 WL 4273122, at *6–7 (Del. Ch. Oct. 28, 2010); *Kelly v. Blum,* 2010 WL 629850, at *10 (Del.Ch. Feb. 24, 2010); *Bay Ctr. Apartments,* 2009 WL 1124451, at *8; *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.,* 854 A.2d 121, 153 (Del. Ch.2004); *VGS, Inc. v. Castiel,* 2000 WL 1277372, at *4–5 (Del.Ch. Aug. 31, 2000), *aff'd,* 781 A.2d 696 (Del.2001).

*Gotham Partners* in the analogous limited partnership context; [64] and culminating with legislative reinforcement in the 2004 Elimination Amendment inspired by *Gotham Partners* that allowed LLC agreements to eliminate fiduciary duties altogether. Reasonable investors in Delaware LLCs would, one senses, understand even

more clearly after the Elimination Amendment that they were protected by fiduciary duty review unless the LLC agreement provided to the contrary, because they would of course think that there would have been no need for our General Assembly to pass a statute authorizing the elimination of something that did not exist at all. [65]

---

64. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 168, 170 (Del. 2002).

65. Admittedly, the Supreme Court's statement in *William Penn* is on its face simply an indication of what the parties agreed. *See William Penn*, 13 A.3d at 756. But *William Penn* also cited to this court's decision in *Bay Center Apartments*, which embraced the same proposition. *Id.* at 756 n. 9 (citing *Bay Ctr. Apartments*, 2009 WL 1124451, at *8). Perhaps more importantly, the seeming import of *William Penn* is identical to the holding of the Supreme Court in the limited partnership context, which is analogous, as explained below. In *Gotham Partners*, the Supreme Court agreed with the holding of this court that, absent a contrary provision in the partnership agreement, "a general partner owes the traditional fiduciary duties of loyalty and care to the limited partnership and its partners." *Gotham Partners*, 817 A.2d at 170. *Gotham Partners* inspired not only the amendment to DRULPA allowing expressly for the elimination of all fiduciary duties, but also the Elimination Amendment to the LLC Act. As noted, this supports the inference that the General Assembly believed both statutes were to be read against equitable principles of fiduciary duty. In the case of DRULPA, the default is, to be sure, to the Delaware Uniform Partnership Law, *see* 6 *Del. C.* § 17–1105, which is modeled off of the Uniform Partnership Act. And, the Uniform Partnership Act *admittedly* refers explicitly to partners having fiduciary duties, *see* 6 *Del. C.* § 1521 (specifying that a partner is "accountable as a fiduciary"). But, when the Court of Chancery first held that the general partner of a limited partnership had fiduciary duties, it relied as heavily on the common law equity decisions to that effect as it did on the Uniform Partnership Act, which was linked to the then-existing Delaware Uniform Limited Partnership Act through 6 *Del. C.* § 1709. *See Boxer v. Husky Oil Co.*, 429

A.2d 995, 997 (Del.Ch.1981) ("The duty of the general partner in a limited partnership to exercise the utmost good faith, fairness, and loyalty is, therefore, required both by statute and common law.") (citing 6 *Del. C.* § 1521 and *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (N.Y.1928)). The Supreme Court's decision in *Gotham Partners* embraced the reasoning of *Boxer*, *see Gotham Partners*, 817 A.2d at 170 n. 30, as did a consistent line of Chancery cases, including the Chancery decisions in *Gotham Partners* itself, *see, e.g., Gotham Partners*, 2000 WL 1476663, at *10 (Del. Ch. Sept. 27, 2000); *see also Wallace v. Wood*, 752 A.2d 1175, 1180 (Del.Ch.1999); *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 322 (Del.Ch. 1998). But the Uniform Partnership Act, as it existed at the time of *Boxer*, hardly specified the full contours of those duties, and was more an acknowledgement of the existence of those equitable duties than a creation of them in the first place. *See* 6 *Del. C.* § 1521 (former provision in Delaware Uniform Partnership Law); *compare* 6 *Del. C.* § 15–404 (Delaware Revised Uniform Partnership Act, the new version of the Delaware Uniform Partnership Law, specifying in more detail the fiduciary duties owed by a partner of a general partnership); *but see* 6 *Del. C.* §§ 17–1105, 17–403 (DRULPA provisions continuing to provide for default to the Delaware Uniform Partnership Law, 6 *Del. C.* § 1501, et seq., rather than the new Delaware Revised Uniform Partnership Act, codified at 6 *Del. C.* § 15–101, et seq.).

Of course, the differences in DRULPA and the LLC Act in terms of the default provisions are arguably still important, in that DRULPA would suggest that judges look initially to the fiduciary duties owed by partners of partnerships in equity, rather than corporate cases, to address whether the general partner of a limited partnership or other person whom equity would regard as owing fiduciary duties had enforceable duties in a particular context and the contours of those duties. By con-

Reasonable minds can debate whether it would be wise for the General Assembly to create a business entity in which the managers owe the investors no duties at all except as set forth in the statute and the governing agreement. Perhaps it would be, perhaps it would not. That is a policy judgment for the General Assembly. What seems certain is that the General Assembly, and the organs of the Bar who propose alteration of the statutes to them, know how to draft a clear statute to that effect and have yet to do so. The current LLC Act is quite different and promises investors that equity will provide the important default protections it always has, absent a contractual choice to tailor or eliminate that protection. Changing that promise is a job for the General Assembly, not this court.

With that statement of the law in mind, let us turn to the relevant terms of Peconic Bay's LLC Agreement.

## 2. The Relevant Provisions Of The LLC Agreement

■ I note at the outset that the Peconic Bay LLC Agreement contains no general provision stating that the only duties owed by the manager to the LLC and its investors are set forth in the Agreement itself. Thus, before taking into account the existence of an exculpatory provision, the LLC Agreement does not displace the traditional fiduciary duties of loyalty and care owed to the Company and its members by Gatz Properties [66] and by Gatz, in his capacity as the manager of Gatz Properties.[67] And although LLC agreements may displace fiduciary duties altogether or tailor their application, by substituting a different form of review, here § 15 of the LLC Agreement contains a clause reaffirming that a form akin to entire fairness review will apply to "Agreements with Affiliates," a group which includes Gatz Properties, that are not approved by a

---

trast, the LLC Act's reference generally to equity as a default and the nature of an LLC as a "company" might suggest logically that managers of an LLC were more like fiduciaries of corporations than like partners of general partnerships, and that the fiduciary duties they owe in equity were to be shaped by those more tailored ones developed in the corporate context, which are powerfully influenced by the policy concerns underlying the business judgment rule. As it turns out, Delaware courts have ended up looking to corporate precedent even in the limited partnership arena, perhaps because the common law addressing the duties of partners is not as rich or often, as contextually relevant, as that addressing the conduct of corporate fiduciaries. E.g., Zoren v. Genesis Energy, L.P., 836 A.2d 521, 528 (Del.Ch.2003) (looking to corporate law concepts when analyzing fiduciary duties of general partner of limited partnership). For present purposes, though, the analysis of the Supreme Court in the limited partnership context in Gotham Partners regarding the existence of default fiduciary duties supports reading the LLC Act as being premised on the default position that managers of LLCs owe fiduciary duties because they fit within the classic definition of a fiduciary of a business enterprise under traditional principles of equity.

66. See, e.g., Kelly, 2010 WL 629850, at *11; Atlas Energy Res., 2010 WL 4273122, at *7.

67. I pause to note that the defendants have recently accepted the proposition that both Gatz Properties and Gatz, as the sole manager of Gatz Properties and, as a result, the person who exercised actual management authority over Peconic Bay, owe fiduciary duties to Peconic Bay and the Minority Members. See Defs. Ans. Pre–Tr. Br. at 4 n. 4. Because this is a point that is no longer contested by the parties, I do not dwell on it further other than to note that Gatz, the person, is clearly liable as a fiduciary under a line of Delaware cases beginning with In re USACafes, L.P. Litigation, 600 A.2d 43 (Del.Ch.1991), which arose in the context of a limited partnership with a corporate fiduciary, but which has evolved to stand for the principle that a human manager of an alternative entity itself charged with managing an alternative entity may owe fiduciary duties directly to the second entity if the human manager exercises control over that second entity's assets. See Bay Ctr. Apartments, 2009 WL 1124451, at *9.

majority of the unaffiliated members' vote. In relevant part, § 15 provides:

> 15. *Neither the Manager nor any other Member shall be entitled to cause the Company to enter ... into any additional agreements with affiliates on terms and conditions which are less favorable to the Company than the terms and conditions of similar agreements which could be entered into with arms-length third parties, without the consent of a majority of the non-affiliated Members* (such majority to be deemed to be the holders of 66–2/3% of all Interests which are not held by affiliates of the person or entity that would be a party to the proposed agreement).[68]

This court has interpreted similar contractual language supplying an "arm's length terms and conditions" standard for reviewing self-dealing transactions, and has read it as imposing the equivalent of the substantive aspect of entire fairness review, commonly referred to as the "fair price" prong.[69] This interpretation is confirmed by the defendants' own understanding of § 15 as requiring that Gatz pay a "fair price" to the Minority Members if Gatz were to acquire Peconic Bay, as reflected by a letter sent from Gatz's counsel to the Minority Members.[70]

Importantly, however, entire fairness review's procedural inquiry into "fair dealing" does not completely fall away, because the extent to which the process leading to the self-dealing either replicated or deviated from the behavior one would expect in an arms-length deal bears importantly on the price determination.[71] Where a self-dealing transaction does not result from real bargaining, where there has been no real market test, and where the self-interested party's own conduct may have compromised the value of the asset in question or the information available to assess that value, these factors bear directly on whether the interested party can show that it paid a fair price. Thus, as written, § 15 permits Affiliate Agreements without the approval of the majority of the Minority Members, subject to a proviso that places the burden on the Manager (here, Gatz) to show that the price term of the Affiliate Agreement was the equivalent of one in an agreement negotiated at arms-length. But, "[i]mplicit in this proviso is the requirement that the [defendants] *undertake some effort* to determine the price at which a transaction with [Gatz] could be effected through a deal with a third party."[72] In other words, in order to take cover under the contractual safe harbor of

---

68. JX–2 § 15 (emphasis added).

69. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 795 A.2d 1, 27 (Del.Ch. 2001), *aff'd in relevant part*, 817 A.2d 160 (Del.2002); *Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 2335353, at *7–8 (Del. Ch. Sept. 20, 2005).

70. JX–70 (Letter from Gatz's Counsel to Members (August 29, 2008)) ("Under the provisions of the [LLC Agreement], the majority members have the right to vote out the minority members, *so long as a fair price is paid for the interests of the minority members.*") (emphasis added).

71. *See Flight Options*, 2005 WL 2335353, at *7 n. 32 ("The notion of arms' length terms

and conditions conjures up an image of real negotiations—the process of give and take.... As a practical matter, the inquiry must be one of whether the price fairly reflects what would have been the outcome of an arms' length negotiation. *The reliability of a determination of price cannot be fairly assessed, at least in this context, without consideration of the process.*") (emphasis added); *see also Valeant Pharmaceuticals Int'l v. Jerney*, 921 A.2d 732, 746 (Del.Ch.2007) ("The two components of the entire fairness concept are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process.").

72. *Gotham Partners*, 795 A.2d at 27 (emphasis added) (where this court faced a similar provision that, in the limited partnership context,

§ 15, Gatz bears the burden to show that he paid a fair price to acquire Peconic Bay, a conclusion that must be supported by a showing that he performed, in good faith, a responsible examination of what a third-party buyer would pay for the Company. As I shall soon discuss, the record convinces me that Gatz has failed to meet the terms of this proviso.

Because the terms of § 15 only apply to Affiliate Agreements, and because these terms address the duty owed by Gatz to the Minority Members as to Affiliate Agreements, they distill the traditional fiduciary duties as to the portion of the Minority Members' claims that relates to the fairness of the Auction and Merger into a burden to prove the substantive fairness of the economic outcome. That is, § 15 distills the duty to prove the fairness of a self-dealing transaction to its economic essence.[73] As to the rest of Gatz's conduct giving rise to this dispute—such as the failure to take steps to address the impending American Golf Sublease termination and the failure to negotiate with an interested buyer in good faith—it is governed by traditional fiduciary duties of loyalty and care because the LLC Agreement does not alter them.

The LLC Agreement does, however, contain an exculpatory provision, which is functionally akin to an exculpatory charter provision authorized by 8 *Del. C.* § 102(b)(7). In relevant part, § 16, governing "Exculpation and Indemnification," reads as follows:

16. *No Covered Person* [defined to include "the Members, Manager and the officers, equity holders, partners and employees of each of the foregoing"] *shall be liable to the Company, [or] any other Covered Person or any other person or entity who has an interest in the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith* in connection with the formation of the Company or *on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence, willful misconduct or willful misrepresentation.*[74]

Thus, by the terms of § 16, Gatz may escape monetary liability for a breach of his default fiduciary duties if he can prove that his fiduciary breach was not: (1) in bad faith, or the result of (2) gross negligence, (3) willful misconduct or (4) willful misrepresentation. Also, in order to fall within the terms of § 16, a Covered Person must first be acting "on behalf of the company" and "in a manner reasonably believed to be within the scope of authority conferred on [him] by [the LLC Agreement]."[75] Thus, § 16 only insulates a Covered Person from liability for authorized actions; that is, actions taken in accordance with the other stand-alone provisions of the LLC Agreement. So, to the extent that the Auction and the follow-on Merger were effected in violation of the arms-length mandate set forth in § 15 (which, as I shall find, they were), such a breach would not be exculpated by § 16. Moreover, even if I were to find that § 16 operated to limit Gatz's liability for actions taken in contravention of the terms of § 15, I find that his actions related to and

---

permitted the sale of partnership units to the general partner only if "the terms of any such transaction [were] substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party.").

73. *See, e.g., id.* at 31–32.

74. JX–2 § 16 (emphases added).

75. *Id.*

in consummation of the Auction and follow-on Merger were taken in bad faith such that he would not be entitled to exculpation anyway.

Notably, the exculpation standard set forth in § 16 is both stronger and weaker than its corporate analogue in terms of limitation of liability. Whereas § 102(b)(7) authorizes a charter provision to exculpate a violation of the directors' duty of care (i.e., gross negligence),[76] here § 16 does not exculpate for a breach of the duty of care. Gatz may still be liable for gross negligence. But, whereas § 102(b)(7) does not authorize exculpation for breaches of corporate directors' duty of loyalty, here § 16 does exculpate Gatz from liability for a breach of his fiduciary duty of loyalty (outside the context governed by § 15) to the extent he shows that the breach was not committed in bad faith or through willful misconduct.

I now analyze the Minority Members' claim that Gatz breached his fiduciary and contractual duties as the Manager of Peconic Bay. Specifically, I conclude that Gatz breached his fiduciary duties of loyalty and care, and the fair price requirement of § 15. He has not proven that these breaches are exculpated, and regardless of whether the Minority Members had the burden to prove his state of mind (which they do not), he acted in bad faith and with gross negligence. I detail the reasons for those conclusions now.

### B. Did Gatz Breach His Contractual And Fiduciary Duties To The Minority Members?

The record convinces me that Gatz pursued a bad faith course of conduct to enrich himself and his family without any regard for the interests of Peconic Bay or its Minority Members. His breaches may be summarized as follows: (1) failing to take any steps for five years to address in good faith the expected loss of American Golf as an operator; (2) turning away a responsible bidder which could have paid a price beneficial to the LLC and its investors in that capacity; (3) using the leverage obtained by his own loyalty breaches to play "hardball" with the Minority Members by making unfair offers on the basis of misleading disclosures; and (4) buying the LLC at an auction conducted on terms that were well-designed to deter any third-party buyer, and to deliver the LLC to Gatz at a distress sale price.

### 1. Gatz Fails To Act Loyally To Protect The LLC When It Becomes Clear That American Golf Will Terminate Its Sublease

#### a. Gatz Knows There Is Trouble With The American Golf Sublease

American Golf began operating the Course on September 20, 1999, and its financial performance was disappointing from the start. Although the Course generated revenue,[77] it never produced enough cash flow to cover American Golf's rent payments to Peconic Bay. Indeed, American Golf's annual operating loss under the Sublease grew from approximately $400,000 in 2000 to over $900,000 in 2008.[78]

Gatz and the Minority Members agree that there were several factors that contributed to these financial losses. First, on the cost front, the Sublease required rent payments that were above-market and not in line with the revenue that the Course could generate under American Golf's management. Second, and more important, American Golf's management per-

---

76. See 8 Del. C. § 102(b)(7).

77. For example, from 2003 to 2008, American Golf generated an average of $2.3 million in gross revenue. JX–124 (Long Island National

Golf Course Financial Statements (December 31, 2008)) at PBG0002885–PBG0002912.

78. Id. at PBG0002889.

formance was seen by Gatz himself as poor and therefore as not generating as much revenue as it could have over the duration of the Sublease. Gatz testified that although American Golf did a "good job" for the first few years, it was having financial problems as a company, and in the early 2000s American Golf was bought by Goldman, Sachs & Co. and Starwood Capital Group.[79] The new financial owners, according to Gatz, were focused on cutting expenses rather than growing the top-line, and this was especially so for American Golfs underwater leases, a category which included the Sublease.[80]

To that end, at trial, both sides repeatedly referred to American Golf as a "demoralized operator."[81] That is to say, American Golf was not managing the Course as a fully motivated operator would have. It neglected maintenance items and allowed the Course to become rundown.[82] Gatz testified that the Course's lapsed condition had a direct (and negative) effect on American Golf's revenue figures, as golfers believed the Course was in financial distress and played fewer rounds.[83] American Golf's financial records confirm that its total income was slowly but steadily decreasing, and its shortfall under the Sublease was rising.[84] Although in 2004, American Golf generated a profit of approximately $760,000 before rent was taken into account, by 2008 its pre-rent profit had dwindled to approximately $187,000.[85]

Given these results, Gatz admitted at trial that he knew by 2004 or 2005 that there was a "high likelihood" that American Golf would exercise its early termination right under the Sublease and walk away from the Course in 2010.[86]

b. *Gatz Does Not Act As A Responsible Fiduciary Would Have Acted*

By the terms of the LLC Agreement, Gatz was charged with the obligation to manage the operations (*i.e.*, the business) of Peconic Bay,[87] and thus had the fiduciary duty to manage that business loyally for the benefit of the Company's members.[88]

79. Tr. 408 (Gatz).

80. *Id.* at 408 (Gatz). Gatz's characterization of American Golf was supported at trial by Matthew Galvin of RDC Golf Group, Inc., who is a former employee of American Golf. *Id.* at 139–40 (Galvin) ("[American Golf] was acquired by an investment group that was not really in the business—it was more of a financial buyer ... [, and] they were not looking to reinvest and improve the properties and manage them for the long-term. They were just looking to stem any losses and exit.").

81. *See id.* at 407 (Gatz) ("Q. I think testimony in this case has been toward the end that everybody referred to them [American Golf] as a demoralized operator. Would you agree with that characterization? A. Yes."); *id.* at 122 (Carr) (referring to American Golf as in a "demoralized condition").

82. *Id.* at 408–11 (Gatz) (describing American Golf's deferring of maintenance items and neglect of the condition of the course's appearance); JX–64A (Gordon & Rees Letter to American Golf (August 4, 2008)) (describing maintenance issues).

83. Tr. 411 (Gatz).

84. JX–124 at PBG0002885–PBG0002912.

85. *Id.* at PBG0002907, PBG0002885.

86. Tr. 417 (Gatz).

87. JX–2 § 7.

88. Delaware law has long recognized that there is an affirmative aspect of the fiduciary duty of loyalty. A "corporate officer or director" has an obligation to "affirmatively ... protect the interests of the corporation committed to his charge...." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939); *see also Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989) (explaining that principles of fiduciary duty "demand that corporate fiduciaries ... affirmatively protect and defend those interests entrusted to them" and "[o]fficers and directors must exert all reason-

This includes the duty to address in good faith known, material risks that threaten the viability of the business.[89] Gatz knew, by at latest 2005, that American Golf was very likely to terminate the Sublease in 2010.[90] With American Golf gone, so too would go its annual $1 million rental payments that constituted Peconic Bay's primary source of revenue. Gatz therefore had a full five years to develop an action plan to address Peconic Bay's viability as a going concern after American Golf's departure.

A responsible fiduciary acting on this basis would have searched for a replacement operator to take over American Golf's Sublease, assessed whether it could modify its business model to operate the Course profitably itself, or looked for a buyer to acquire Peconic Bay or its assets. Indeed, options like these were specifically contemplated by the LLC Agreement in the event that the American Golf Sublease was no longer in effect.[91] Moreover, a responsible fiduciary in Gatz's position would have embarked on this process right away, when Peconic Bay was still in a position of strength—that is, while Peconic Bay still had five years of guaranteed annual income of at least $1 million—in order to leverage this strength into a deal that delivered value to Peconic Bay's investors.

Gatz did none of these things. The record is devoid of any credible evidence suggesting that Gatz engaged in a serious or thoughtful effort to look for a replacement operator. There is no evidence that Gatz, in 2005, considered putting Peconic Bay on the market, which would have entailed hiring an appraiser to assess Peconic Bay's value, putting together offering materials, or engaging a broker to start a search for strategic buyers who might be interested in acquiring the entity. Nor is there evidence that Gatz engaged in a serious analysis at the time to assess whether Peconic Bay could feasibly run the Course itself.

Rather, Gatz did two things in anticipation of American Golf's termination of the Sublease. First, he sat back and waited for the time on the Sublease to run. Second, he husbanded Peconic Bay's cash surplus under a provision in § 11 of the LLC Agreement that allowed him to withhold from distribution to Peconic Bay's members those funds that he "reasonably determine[d] [were] necessary to meet the Company's present or future obligations,"[92] in this case, Peconic Bay's future debt payments following American Golf's termination of the Sublease. Gatz justified this decision in the following way. Because he expected American Golf to exercise the early termination option in the

---

able and lawful efforts to ensure that the corporation is not deprived of any advantage to which it is entitled."); *In re The Walt Disney Co. Deriv. Litig.*, 2004 WL 2050138, at *5 n. 49 (Del.Ch. Sept. 10, 2004) (noting that the "duty of loyalty ... imposes an affirmative obligation to protect and advance the interests of the corporation.") (citation omitted); Lyman Johnson, *After Enron: Remembering Loyalty Discourse in Corporate Law*, 28 Del. J. Corp. L. 27, 40 (2003) (discussing the duty of loyalty's demand of "devotion," *i.e.*, the fiduciary obligation to affirmatively protect corporate interests).

89. *See, e.g., Stone v. Ritter*, 911 A.2d 362, 370 (Del.2006).

90. Tr. 417 (Gatz).

91. JX–2 § 4 ("Purposes") ("The initial purposes of the Company shall be ... (v) to lease ... the Project to [American Golf] ..., or *to such other golf course operator as shall be approved by Majority Approval of the Members*, and (vi) *to sell or otherwise dispose of the Project upon termination of the [American Golf] Lease (or such other lease as may be entered into with Majority Approval of the Members), or to re-lease or otherwise deal with the Project in such manner as may be determined by Majority Approval of the Members.*") (emphasis added).

92. *Id.* § 11.

Sublease, thus depriving Peconic Bay of its primary source of revenue, any cash surplus that Peconic Bay generated had to be set aside in order to ensure that it was able to satisfy its debt payments in the event that a replacement rental stream could not be found. This cash surplus was not insubstantial. By mid–2009, Peconic Bay had approximately $1.6 million in cash sitting on its balance sheet.

Gatz's actions were inconsistent with those of someone whose duty it was to seek out ways to preserve value for Peconic Bay's investors. Rather, they were consistent with those of someone who was hoping that that Peconic Bay would simply revert back to his family's ownership once Peconic Bay's primary source of revenue ran dry, without regard for the interests of the Minority Members.

What motivated Gatz to abandon his fiduciary helm? I conclude that there were two primary considerations driving Gatz's actions. First, there were financial considerations. According to the terms of the Ground Lease, Gatz Properties as landlord to Peconic Bay was only entitled to Ground Lease Rent of 5% of the gross revenue generated from the operation of the Course. This was the Gatzes' only source of income from the Property, other than as owners of Peconic Bay's equity, and over the life of the Sublease, the Ground Lease Rent diminished from approximately $134,000 per year in 2003 to approximately $99,000 in 2008.[93] As long as the Property was encumbered by the Ground Lease, the amount of money that the Gatz family could expect to earn from it was limited.

Also, in 2007 to 2008, Gatz came to believe that the Property was worth more vacant than encumbered with the Ground Lease and its restriction that the Property be used exclusively as a golf course. The bank involved in a 2007 refinancing of the Note hired an appraiser to assess the market value of the Property, which served as collateral to the Note. The bank asked the appraiser to value the Property under two scenarios: (1) unencumbered and available for development ("as vacant"); and (2) encumbered by the long-term lease limiting its use to a golf course ("as improved").[94] This report (the "Rogers & Taylor Appraisal") valued the land as vacant at $15 million, but as improved at only $10.1 million. This was due to the Rogers & Taylor Appraisal's conclusion that the "highest and best use" of the Property was for residential development, rather than as a golf course, and thus it was worth more as vacant land available for residential development.[95]

The results of the Rogers & Taylor Appraisal, which were made known to Gatz by 2008 at the latest, reinforced what Gatz already had come to believe, which was that his family was better off unencumbering the Property from the long-term leasehold to Peconic Bay, which was not panning out financially under American Golf's management; getting rid of the Minority Members; and restoring the family's fee simple ownership of the Property, as improved by Peconic Bays' investment. That would allow the Gatz family to exploit the land either as a primarily residential community, or as a combination residential-golf course community.

93. *See* Tr. 506 (Gatz—Cross); *see also* JX–124.

94. JX–97 (Rogers & Taylor Appraisal for Flushing Savings Bank (December 5, 2006)) at PBG0002965.

95. *Id.* at PGB0003002.

The second consideration that motivated Gatz's actions was as personal. After listening to the in-court testimony, it was apparent to me that Gatz did not like having minority investors interfere with what he believed to be primarily a Gatz family venture. Gatz had needed outside investors to create Peconic Bay, but he wanted only their capital, not their advice or input; he wanted them to be mute, passive, and compliant. In other words, he had no patience for being a manager of an LLC with outside investors. Gatz came across as someone who was not comfortable with receiving input from outside investors when it came to making Company decisions [96] and was fed up with dealing with the Minority Members, especially Carr of Auriga. The relationship between Gatz and Carr had soured in the years since they formed Peconic Bay, and it had become acrimonious. Hostile email exchanges were the norm.[97] Lawsuits were being launched.[98] Gatz viewed Carr as "contentious,"[99] and the rest of the Minority Members as "impediments for [Peconic Bay's] chance of success."[100] I am left with the firm impression that Gatz concluded that he wanted the "contentious" Carr out of Peconic Bay, along with the rest of the Minority Members, and he wanted them out sooner rather than in 2038, when the Ground Lease was set to expire.

Thus, Gatz wanted the clock on the Sublease to run for the selfish reason of placing Peconic Bay in a position of economic weakness, which he could later exploit for the exclusive financial benefit of himself and his family. By failing for five years to take *any* steps to preserve Peconic Bay's viability, Gatz hoped to gain leverage to eliminate the Minority Members and restore the Property to his family's sole ownership. That was fiduciary infidelity of a classic variety.[101]

### 2. Gatz Rebuffs A Credible Buyer For Peconic Bay's Leasehold

■ In August 2007, Matthew Galvin, on behalf of RDC Golf Group, Inc. ("RDC") approached Gatz with an interest

---

**96.** *E.g.,* JX–38 (Email from Gatz to Minority Member Ivan M. Benjamin, Jr. (April 18, 2007)) ("I've been informed by representatives of American Golf Corporation that you have been in contact with them. As I'm the manager of Gatz Properties which in turn is the manager of [Peconic Bay], and as manager I'm the only representative of [Peconic Bay]. I ask that your representation/contact as otherwise must stop. If you refuse to do so then we will be forced to take appropriate actions.").

**97.** *E.g.,* JX–64 (Email from Gatz to Carr (May 9, 2008)) ("Mr. Carr; [o]nce again, your ... letter contains nothing but baseless accusations and demands....It appears that you disagree with any decision I make. That along with the continuing venom in each of your communications tells me your actions are based upon personal dislike rather than any proper business basis....").

**98.** In 2005, Auriga sued to remove Gatz as manager in a New York lawsuit. In 2006,

Auriga instituted a books and records action in this court. Tr. 29 (Carr). In 2009, Auriga sued to preliminarily enjoin the Auction. When I denied Auriga's motion and the Auction closed, Auriga, along with the rest of the Minority Members in this current action, pursued this suit seeking money damages in 2010.

**99.** *See* Def. Post–Tr. Op. Br. at 7.

**100.** JX–65 (Letter from Gatz to Peconic Bay Members (August 7, 2008)).

**101.** *See, e.g., Boyer v. Wilm. Materials, Inc.,* 754 A.2d 881, 899 (Del.Ch.1999) ("The duty to deal fairly requires the fiduciary 'not to time or structure the transaction, or to manipulate the corporation's value, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price.' ") (citing *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,* 532 A.2d 1324, 1335 (Del.Ch.1987)).

in acquiring Peconic Bay's long-term lease. RDC is an experienced owner and operator of public and private golf courses. Galvin, a former employee of American Golf and someone with general knowledge of the industry, knew that American Golf was operating the Course and that American Golf was in the process of winnowing down its portfolio of golf courses as part of the strategy implemented by its new financial owners. Even though Galvin was aware that American Golf had been losing money on the Course on a post-rent basis, he believed that RDC could profitably operate the Course business by investing resources in it. To that effect, he testified at trial:

> [The Course] was a great facility. It was designed by a great architect. We felt that it could be improved from American Golf's operation.... We thought we could add value there and, as a tenant with time running out, [American Golf] [was] not committing the right resources and attention to it. So we felt we could improve it and that there would be an opportunity for us to grow the business there.[102]

So, Galvin contacted Gatz to express his willingness to engage in negotiations, and asked for basic due diligence to help him come up with an offer. Specifically, Galvin asked to review the Ground Lease, the Sublease, and American Golf's historical financials.

Despite Galvin's willingness to enter into a confidentiality agreement, Gatz refused to provide Galvin even with this basic information, and instead demanded to see Galvin's projections for the Course. Galvin told Gatz that, on a preliminary basis, he thought RDC could achieve annual gross revenues of $4 million on the Course. Gatz testified at trial that if RDC could achieve $4 million in gross revenues, then the Course would be worth $6 million to $8 million.[103] Rather than use RDC's optimistic projections as a basis to bid Galvin up, Gatz criticized the projections and told Galvin that they were too high. Galvin testified that he was not concerned with the fact that his revenue projections were greater than what American Golf could generate because he was aware that other operators had taken over courses from American Golf and had substantially increased their financial performance.[104]

Upon Gatz's insistence that he prove he was not on a "fishing expedition," [105] Galvin submitted a non-binding letter of intent, offering to buy Peconic Bay's leasehold assets (the Ground Lease and the Sublease), exclusive of any other assets or liabilities, for $3.75 million.[106] At no point did Gatz inform Galvin that Peconic Bay had debt in excess of $5.4 million, and that his bid was underwater even taking into account the Company's approximately $1.6 million in cash. Instead, Gatz put Galvin's offer up to a membership vote, knowing that the offer would be rejected by the Peconic Bay Members because such a purchase price would render Peconic Bay insolvent. Even sillier, Gatz knew that the vote would fail for another reason: his family intended to vote all their units against it, dooming it to failure. In short, there was no legitimate need for a phony vote. Gatz then waited nearly one month before telling Galvin that his offer had been rejected. Gatz made no counteroffer, continued to refuse Galvin basic due diligence materials, and showed a clear dis-

102. Tr. 139 (Galvin).

103. *Id.* at 532 (Gatz—Cross).

104. *Id.* at 147 (Galvin).

105. JX–170 (Email Exchanges between Gatz and Galvin (various dates)) at RDC000031.

106. *See* Tr. 155–56 (Galvin).

dain for continuing negotiations when Galvin requested a target asking price.

Galvin nonetheless submitted a second letter of intent, upping his offer to $4.15 million. Strangely, Gatz once more put this underwater bid up for a vote when the Gatz family opposed it, and, not surprisingly, it was unanimously rejected by all Members.

Following the rejection of Galvin's second letter of intent, on November 12, 2007 Carr suggested to Gatz that he go back to Galvin to see if RDC would agree to a deal at $6 million. But, Gatz told Galvin on December 14, 2007 that "no further discussions would be fruitful unless RDC is willing to discuss a price well north of $6 million." [107] On December 29, 2007, Galvin responded favorably, writing "we may have an interest north of $6 million." [108] He asked Gatz for a target range of values so that RDC was not "bidding against [itself]." [109] Gatz refused to give one. On January 4, 2008, Galvin wrote again that "we may be able to get more aggressive but that would probably open up a can of worms—for example, we could offer more money but would want to extend the lease term," and suggested that a deal could get done if the parties could sit down and negotiate towards a binding agreement. [110] Gatz did not respond.

On January 22, 2008, Galvin reached out to Gatz once more, this time with the idea that RDC could take over the Sublease and operate the Course if American Golf exercised its early termination option in 2010 (the "Forward Lease Proposal"). In an email, Galvin set forth a list of proposed terms to guide negotiations. Galvin wrote that although the non-economic terms of the Sublease could remain the same, RDC would want to renegotiate the rent terms and was prepared to offer a base rent plus a percentage rent to Gatz Properties as currently provided for in the Sublease. Galvin thought the Forward Lease Proposal would be attractive to Gatz because it would minimize the risk associated with Peconic Bay having to operate the Course itself and it would provide an assured source of rent if American Golf left. Gatz chose not to respond, even though he knew that the existing Sublease with American Golf was likely to end. After failing to hear back from Gatz, Galvin abandoned his effort to acquire or operate the Course. He was burned by this overall process and felt as if he were "being strung out [by Gatz] with no intention of having any good-faith interest in selling." [111]

At no point in his dealings with Galvin did Gatz act like a motivated seller. A motivated seller does not refuse to provide basic due diligence to a credible buyer. A motivated seller does not fend off a credible buyer or dissuade him from making an offer in excess of the debt. A motivated seller does not criticize a credible buyer because his financial projections are too optimistic, especially when, as here, that seller has a basis to believe that the current financial results are not truly representative of what could be achieved with proper management, and especially when the bidder has been denied standard due diligence by the seller itself. Gatz admitted that the Course's revenues were declining because American Golf was a "demoralized operator" and letting the Course deteriorate. [112] Gatz knew and believed that a motivated operator could do better with the Course.

107. JX–170 at RDC000018.

108. *Id.*

109. *Id.*

110. *Id.* at RDC000016.

111. Tr. 171 (Galvin).

112. *Id.* at 411 (Gatz).

At trial, Gatz offered weak explanations for his behavior.[113] For example, he testified that he did not think RDC's Forward Lease Proposal was serious because the terms of the Proposal were sent unsigned in an email message rather than separately attached on official RDC letterhead.[114] This and others of Gatz's supposed reasons for fending off RDC are thin pretexts for his true motivation. At bottom, Gatz wanted to oust the Minority Members from Peconic Bay. He was always a buyer, never a seller.

Indeed, at trial Gatz admitted under questioning from his own counsel that he and his family were not interested in selling Peconic Bay's leasehold to a third-party:

Q: Mr. Gatz, turning back to the discussions you had with Matt Galvin at RDC....I think you've established this, but let's be clear. Were you, being Gatz Properties, a seller in 2007?

A: No, we were not.

Q: Were you doing anything to solicit a sale of the property or to solicit offers for [Peconic Bay] or the underlying property?

A: No, I was not.

Q: Absent a Powerball ticket kind of offer, was your family going to vote in favor of any transaction for the sale of [Peconic Bay] or the underlying property?

A: No, they weren't.[115]

In part, Gatz's lack of interest in pursuing a sale was due to the favorable treatment accorded to the Class B Members under the distribution waterfall set forth by the terms of the LLC Agreement. Gatz would not have wanted to approve a transaction with a third-party bidder that would have delivered substantially more value pro rata to the Minority Members while leaving the Gatz family stuck with a leasehold on their Property for another two decades.[116]

As a buyer, not a seller,[117] Gatz down-

113. For example:

Gatz's explanation for why he would not give Galvin the requested due diligence information: Gatz "had given him the information in 2003" in connection with discussions the two had had about potentially turning the Course into a private course. *Id.* at 519 (Gatz—Cross).

Gatz's explanation for why he did not respond to Galvin's inquiry related to the Forward Lease Proposal: "I waited for two weeks and figured if Mr. Galvin was serious, he would get in touch with me. I never heard from him, so I dropped it." *Id.* at 570 (Gatz—Cross).

Gatz's explanation for why he was not willing to confirm RDC's financial ability to consummate a transaction with Peconic Bay with Morgan Stanley over the telephone rather than on written letterhead: because he was worried that "[a]nybody could have answered that phone and given me any information." *Id.* at 545 (Gatz—Cross).

114. *Id.* at 458 (Gatz) ("My first reaction to [the Forward Lease Proposal] was, you know, these are discussion points only, to initiate a conversation. It wasn't on a letterhead. It wasn't signed. There is no financial consideration here. So these were just discussion points.").

115. *Id.* at 610 (Gatz).

116. *See id.* at 450 (Gatz) ("Gatz Properties wanted to make a return on its investment too. And at $6 million, it wasn't making any return on its investment. The Class Bs would have been basically ... made whole, and the Class A membership, where we owned the majority of the Class As, we were getting pennies on the dollar at best.").

117. *Id.* at 556–57 (Gatz–Cross) ("A. I wasn't on the market. I wasn't interested in selling. So I wasn't about to create a value for something that I don't know if everybody else [the Gatz Members] was willing to sell at. Q. [the court] You weren't interested in selling, but you were interested in buying? A. Yes, I was."); *id.* at 566 (Gatz—Cross) ("Q. The reason the majority voted against making a

played the value of Peconic Bay and the Course to Galvin and to the Minority Members. At no point did he act consistent with his fiduciary duty to preserve value for his investors, including the Minority Members, at a point in time when he knew that a replacement strategy for the contract with American Golf was necessary for Peconic Bay to remain a viable going concern. Rather, he used Galvin's arrival for show and as an opportunity to create a misleading impression of what Peconic Bay was worth to a third party in order to buy out the Minority Members on that basis.

3. *Gatz Uses Galvin's Interest In Peconic Bay To Play "Hardball" With The Minority Members And Attempt To Buy Them Out*

 At trial, Gatz revealed the true reason why he submitted Galvin's bids of $3.75 million and $4.15 million to a vote of the full membership despite knowing that the proposals would not succeed because his family would vote no. He wanted to show the Minority Members "what a third-party person would value the company at." [118] In this way, Gatz could employ Galvin's underwater offers to justify his own low offer to the Minority Members. In other words, by stringing Galvin along, Gatz could turn RDC's interest in Peconic Bay into a sword to use against the Minority Members.

Gatz testified that his family would "probably not" approve a deal with RDC at $6 million. [119] But, when Carr asked Gatz to see whether Galvin would be willing to buy Peconic Bay at $6 million, Gatz used the opportunity to determine whether the rest of the Minority Members would sell at $6 million. To that end, Gatz sought authorization from the membership to make a counteroffer of $6 million to RDC knowing beforehand that it would not pass. The Minority Members voted in favor of the proposal, but the Gatz Members voted it down. But, Gatz was now armed with the information that the Minority Members were willing to sell at $6 million.

On January 14, 2008, Gatz wrote to the Minority Members:

> Negotiations with RDC have broken off with their best offer of $4.15 million being rejected. Offering a counterproposal of $6 million to RDC as Bill Carr suggested did not receive majority approval from the members. *It has become apparent to me, that most of you (like Bill Carr) would have been satisfied with a cash out of the investment in [Peconic Bay] at a price that a $6 million cash sales price to a third party would have yielded. I as well as other members aren't interested in selling [Peconic Bay's] asset at $6 million but understand your desire to cash out* and not wait on future developments. [120]

Gatz was not a willing seller at $6 million, but he was a willing buyer. In that same letter, Gatz offered to purchase the Minority Members' interests for a "cash price equal to the amount which would be distributed for those interests as if [Peconic Bay's] asset sold for a cash price of $5.6 million as of today," and he explained that "the results would be as if the sale were for more than $6 million," because in a third-party sale, the purchaser would have

counteroffer is because they didn't want to sell; right? A. No. They weren't interested."); *id.* at 569 (Gatz—Cross) ("A. [Carr] made several overtures [about buying the Gatz Members out]. Q. And you told [Carr] that you're not for sale because you're a buyer, not a seller; right? A. Yes.").

118. *Id.* at 445 (Gatz).

119. *Id.* at 450 (Gatz).

120. JX–50 (Letter from Gatz to Minority Members (January 14, 2008)) (emphasis added).

to pay closing costs and prepayment penalties on the Note of approximately $475,000.[121] Accordingly, by subtracting Peconic Bay's debt, adding Peconic Bay's cash, and distributing the remainder according to the distribution waterfall set forth in the LLC Agreement, Gatz arrived at his offer to the Minority Members of $734,131.[122] This would have yielded a return of each Minority Member's initial capital investment. Gatz, however, conditioned this offer on the acceptance of *all* the Minority Members and indicated that his offer would be open for only fifteen days because, supposedly, "time [was] of the essence."[123]

Gatz's offer to the Minority Members contained incomplete and misleading information about the RDC negotiations. Specifically, Gatz failed to inform the Minority Members that Galvin had told Gatz that RDC "may have an interest north of $6 million," and that he "may be able to get more aggressive" than his last bid of $4.15 million.[124] Gatz also failed to inform the Minority Members that Gatz never followed up on Galvin's invitations to negotiate or that RDC had bid without any benefit of due diligence. Rather, Gatz conveyed the misleading impression that RDC—a reputable third-party buyer—was only willing to pay $4.15 million for Peconic Bay's assets so that Gatz's own offer would appear more attractive. This conduct—intentionally misleading the Minority Members when accurate information concerning third-party offers would have been material to their decision whether to accept Gatz's own offer—further supports an inference of bad faith.

All but one of the Minority Members rejected Gatz's offer. Carr explained at trial that he was willing to sell at $6 million to RDC only if the Gatz Members also had voted to sell at that price. That is, Carr believed that the value created by eliminating the leasehold position on the Property gave Gatz "a large incentive to top any [third-party] bid that could be generated."[125] If Gatz and his family were willing to sell at $6 million, then Carr would have felt that "our [the Minority Members'] interests would be aligned with [Gatz's]," and Carr would have been satisfied with the fairness of the price.[126] Their rejection, however, gave Carr a basis to believe that the fair value of the Minority Members' shares obtainable in an arms-length negotiation was greater than $6 million. In other words, Carr wanted to use the counteroffer as a "market test."[127]

When Gatz's initial buyout offer failed, he hired an appraiser for the purpose of justifying a lower buyout price.[128] On behalf of Peconic Bay, Gatz hired Laurence Hirsh of Golf Property Analysts to "estimate the value of the leasehold ... position fo[r] possible future disposition...."[129] Gatz did not tell Hirsh that

---

121. *Id.*

122. Including non-party Hartnett, Gatz offered the minority investors $784,405.

123. JX–50.

124. JX–170 at RDC000018, RDC000016.

125. Tr. 32 (Carr).

126. *Id.* (Carr)

127. *Id.* at 33 (Carr).

128. *See id.* at 462 (Gatz) ("Mr. Carr and I had been bickering about the value of the company for years. I wanted to settle it once and for all and see if Mr. Carr was right or myself was right, so I engaged Mr. Hirsh.").

129. JX–99 at PBG0001494. Hirsh had sound credentials. But, Gatz withheld from him material information that was relevant to Hirsh's analysis. Thus, I am skeptical of his analysis, which was shaped largely on the basis of inputs from Gatz, who was trying to demonstrate that Peconic Bay had a low value.

the "future disposition" was to be to Gatz Properties, not a third-party buyer. Nor did Gatz tell Hirsh that RDC had offered to buy Peconic Bay's assets for $4.15 million; that Galvin had projected that the Course could earn annual gross revenues of $4 million if American Golf were out of the picture; or that Galvin had been open to considering a bid "north of $6 million." [130] Hirsh performed a discounted cash flow analysis of the leasehold without the important benefit of this information. Rather, using a combination of American Golf's historical financials (without taking into account that American Golf was a "demoralized operator") [131] and data from peer golf courses in the area, Hirsh projected that the Course's gross revenues would range from $2.4 million to $2.7 million as a daily fee course in the three years following American Golf's termination of the Sublease. Based on these numbers, Hirsh valued Peconic Bay's leasehold as of June 2008 at $2.8 million as a daily fee course and $3.9 million as a private course. Thus, Hirsh appraised Peconic Bay's leasehold for $1.35 million less than what a third-party buyer was willing to pay only months prior.

On August 7, 2008, Gatz wrote to the Minority Members once more with a new buyout offer, this time trumpeting Hirsh's appraisal to prove that "[Peconic Bay] has no value even after application of its [cash] reserves to its debt." [132] For that reason, Gatz lowered his offer price to 25% of each Minority Member's capital account balance, even though he had offered to return their investment in full only eight months earlier. Gatz told the Minority Members

that he was willing to make the Hirsh report available to any of them for the "refundable" fee of $250, plus shipping.[133] According to Gatz, this second buyout offer was a "more than fair and equitable" way to "resolve" the Minority Member problem.[134]

Notably absent from the August 7 buyout letter was any mention of Galvin's Forward Lease Proposal and Gatz's rejection of it, which occurred after Gatz made his first buyout offer. But, the Minority Members were not willing to sell for 25 cents on the dollar. When the Minority Members did not respond favorably, Gatz and his family retained counsel at Blank Rome LLP to threaten the Minority Members with litigation if they continued to refuse his offers for their membership interests. Specifically, Gatz's counsel wrote:

> Under the provisions of the [LLC Agreement], the majority members have the right to vote out the minority members, *so long as a fair price is paid for the interests of the minority members.* Given the existing debt which [Peconic Bay] is obligated to repay, as well as the value determined by Golf Property Analysts, *that value is, at best, zero. Thus, the offer to the minority members to pay substantially more than zero to acquire the interest of the minority members is more than fair . . . .*
>
> *If the minority members are not willing to negotiate a resolution of the value of their interests in [Peconic Bay], the majority will have no choice but to file an appropriate action with the Delaware Court of Chancery to establish such a price through the litigation process.*[135]

130. JX–170 at RDC000017.

131. *See* Tr. 776 (Hirsh—Cross).

132. JX–65. *Compare* Tr. 411 (Gatz) (admitting that American Golf's lack of maintenance and commitment to the Course was a negative

factor for golfers' willingness to play at Peconic Bay).

133. *Id.*

134. *Id.*

135. JX–70 (emphasis added).

At trial, Gatz described this tactic as his attempt to play "hardball" with the Minority Members.[136] His choice of the word "hardball" reveals in plain terms how he viewed the Minority Members: as competitors, not teammates. A fiduciary may not play "hardball" with those to whom he owes fiduciary duties, and our law provides recourse against disloyal fiduciaries or controllers who use their power to coerce the minority into economic submission.[137]

### 4. Gatz Conducts A Sham Auction

Following this letter, Carr surmised to fellow Minority Member Don Kyle: "I think the final battle is looming."[138] On December 8, 2008, Gatz wrote to the Peconic Bay membership that he was proposing to put Peconic Bay up for auction. In this letter, Gatz stated that Gatz Properties intended to bid at the Auction, and that he believed that "the use of an independent, third party auctioneer would satisfy the 'arms-length requirement' set forth in Section 15 of the LLC Agreement."[139] The Gatz Members approved the proposal with their own voting power. At the end of 2008, Peconic Bay had approximately $1.4 million in cash, with two full years left on the Sublease. With annual debt service at that time of approximately $520,000, Peconic Bay had at least a three year cushion of cash with which to pursue other strategic options, such as engaging a broker to market Peconic Bay to golf course owners and operators or developing a plan to operate the Course itself, and did not have to auction itself off in distress sale mode.

Nevertheless, Gatz set out to hire an auctioneer. To help with the search, he engaged Blank Rome, his personal legal advisors who had been representing him in his efforts to buy out the Minority Members, on behalf of Peconic Bay. This meant that Blank Rome was representing both the seller and the potential buyers (the Gatz family). With the assistance of his (conflicted) counsel, Gatz claims to have considered three different auction firms. The first two were reputable and had experience auctioning golf courses, but Gatz felt they were too "expensive."[140] Instead, in February 2009, Gatz sought approval from the membership to hire an auctioneer at the third auction firm—Richard Maltz ("Maltz") of Maltz Auctions, Inc. Maltz Auctions specialized in "debt related" sales, and conducted the majority of its work for bankruptcy courts.[141] Richard Maltz was the son of the business's found-

---

**136.** Tr. 469 (Gatz).

**137.** *See, e.g., Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.,* 120 A. 486, 491 (Del.Ch.1923) ("The majority thus have the power in their hands to impose their will upon the minority in a matter of very vital concern to them. That the source of this power is found in a statute, supplies no reason for clothing it with a superior sanctity, or vesting it with the attributes of tyranny. When the power is sought to be used, therefore, it is competent for any one who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise. When examined by such a court, if it should appear that the power is used in such a way that it violates any of those fundamental principles which it is the special province of equity to assert and protect, its restraining processes will unhesitatingly issue."); *accord Boyer v. Wilm. Materials, Inc.,* 754 A.2d 881, 899 (Del. Ch.1999) (a fiduciary must make an " 'informed, deliberate judgment, in good faith,' that the transaction is fair and not a 'vehicle for economic oppression.' ") (citing *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,* 532 A.2d 1324, 1335 (Del.Ch.1987)).

**138.** JX–71 (Email from Carr to Don Kyle (September 4, 2008)).

**139.** JX–72 (Letter from Gatz to Peconic Bay Members (December 8, 2008)).

**140.** Tr. 479–80 (Gatz).

**141.** *Id.* at 811 (Maltz—Cross).

er and not a seasoned professional with experience marketing expensive, complex assets.[142] And, to the best of Maltz's knowledge, neither he nor anyone else at the firm had ever auctioned an interest in a golf course before.[143] Gatz entered into an auction agreement with Maltz in late May 2009.

Hirsh stated in his 2008 appraisal that Gatz would need six to nine months to properly market Peconic Bay.[144] But, Gatz and Maltz decided on a marketing timeframe of approximately 90 days, and the Auction date was set for August 18, 2009. The marketing plan and advertisements were approved in advance by Gatz and his counsel. The first advertisements were placed at the end of June 2009, less than two months before the Auction date. The advertisements consisted of small-print classified ads (some the size of postage-stamps) in general circulation newspapers, such as the *New York Times,* the *Wall Street Journal,* and the *Suffolk Times & News Review.* The ads also appeared in, among other magazines, *Long Island Golfer.* Maltz determined what websites to advertise on by running an online search with terms like "golf courses for sale."[145] Direct mailings were sent out, but Maltz could not produce any written evidence of or recall the names of the recipients. There is no credible evidence that any golf course brokers, managers or operators were contacted directly by Maltz or his team. Maltz's own testimony on the subject was, to put it mildly, embarrassing. He had no knowledge of having done any targeted marketing of any kind and radiated a strange combination of arrogance about his short years of experience as an auctioneer in his father's firm and total ignorance about the marketplace for selling golf course interests. Gatz never told Maltz about RDC's prior interest in acquiring Peconic Bay's leasehold, much less encouraged Maltz to contact Galvin of RDC and encourage him to bid. At trial, Galvin credibly testified that he was never contacted by Maltz or anyone working on behalf of Gatz about the Auction.

The due diligence package was not made available until at least July 16, 2009, only a month or so before the Auction. Potential bidders had to pay $350 to obtain the package.[146] Maltz testified that two or

142. Maltz was a recent entrant to the workforce who joined his family's firm after his college graduation. After listening to his trial testimony and observing his demeanor in court, I doubt whether he conveyed the appropriate level of gravitas, experience, knowledge or even ordinary seriousness that golf course operators or managers would expect from someone selling an expensive long-term leasehold in a golf course.

143. Tr. 815 (Maltz—Cross).

144. JX–99 at PBG0001542.

145. Tr. 826 (Maltz—Cross).

146. The due diligence materials were themselves less than optimal. Rather than being a well-organized set of materials designed to attract bids, they were a mess that included all kinds of information such as: (1) the final conclusions from Hirsh's 2008 appraisal valuing Peconic Bay at less than its debt, *see* JX–168 (Auction Due Diligence Materials) at PBG0001608; (2) Gatz's second buyout letter to the Minority Members stating that Peconic Bay was worthless, *see id.* at PBG0001906; (3) the "hardball" letter from Gatz's counsel to the Minority Members, *see id.* at PBG0001910; (4) pleadings from prior litigation between Auriga and Gatz alleging that the Auction was a "sham" contrived to buy out the Minority Members, *see id.* at PBG0001732; and (5) Gatz's communication to the Minority Members stating his intention to bid at the Auction, *see id.* at PBG0001899. It may be that this information had to be disclosed in a data room, but the overall package is again indicative of what a faithless fiduciary interested only in buying the assets himself would have generated, not a motivated fiduciary and advisor trying to do what was best for Peconic Bay.

three parties requested the package, but consistent with his general lack of interest or knowledge of the sales process he could not recall their names or if anyone on his team contacted them directly.

The auction terms (the "Terms of Sale") were made available in mid-July 2009 as well, and were based on a prior term sheet used by Maltz for a Chapter 7 liquidation sale. The Terms stated that Peconic Bay would be sold "as-is," "where-is," and "with all faults," without any representations or warranties.[147] This meant that potential buyers had only one month before the Auction in which to conduct the necessary due diligence before deciding whether to bid on this "as-is" entity.[148] According to the Terms of Sale, the "High Bid at Auction" had to be one that, among other requirements, resulted in the repayment in full of the debt, or the assumption of the debt with the required consent of the bank. That meant that potential bidders had less than 35 days to work out an agreement with the bank before the Auction date.[149] Gatz did not approach the bank in advance to secure a pre-packaged financing for financially qualified bidders. Nor did Maltz suggest such a move, which would have obviously helped to stimulate competitive bids. Perhaps most important, the Terms of Sale also made clear that Gatz—whose family other bidders would know controlled the majority of the voting interests in Peconic Bay and was a likely bidder—reserved the right to cancel the Auction at any time before bidding.[150] In other words, bidders knew that if Gatz did not like his odds, he could just pull the plug.

On the day of the Auction, Maltz told Gatz that their marketing campaign had not elicited any third-party interest, and that Gatz would be the only bidder. Upon hearing this news, Gatz did not suggest cancelling the Auction to rethink their marketing efforts, as a well-motivated fiduciary would have done. Nor did Maltz. Rather, Gatz finalized his bid in the absence of any competitive pressure, and purchased Peconic Bay for $50,000 in new cash and the assumption of Peconic Bay's debt. This resulted in a $20,985 distribution to the Minority Members, which was funded by Peconic Bay's own approximately $1.6 million in cash. Gatz assumed the rest of that cash as part of the follow-on Merger. Upon questioning by the court at trial, Gatz admitted that that had there been another bidder at the Auction, he "might have bid higher" than $50,000.[151]

147. JX–10 (Terms and Conditions of Sale (August 18, 2009)) § 9.

148. Galvin testified at trial that, although he eventually learned about the Auction from other sources, RDC was dissuaded from bidding in part because of the unreasonableness of the Terms of Sale. E.g., Tr. 172 (Galvin) ("[W]e felt that the auction terms would not have given us the due diligence we normally would have needed with the due diligence period and reps and warranties. So we did not bid on it. . . . Had it been, in my opinion, a bona fide auction like I've bid on elsewhere . . . I would have been more eager to pursue it. . . . Q. [the court] Have you bid on auctions where it was as-is? A. Yes. I bought a golf course from the U.S. Customs Service where it was as-is, but there was a significant previous period of due diligence that was allowed. . . . [And] [y]ou're not bidding against the potential—the seller is not a potential competitor in the bid.").

149. See JX–10 § 4 ("[T]he term 'High Bid at Auction' means the amount of the bid received by the Auctioneer at the Sale Auction from a Qualifying Bidder in accordance with these Terms and Conditions of Sale that . . . (ii) results in the repayment in full, or with the required consent of [the bank], the partial repayment and refinancing, rollover and/or assumption in full, of all of the Company's outstanding indebtedness and related obligations . . .") (emphasis added).

150. See id. § 15.

151. Tr. 621 (Gatz–Cross).

Maltz walked away with $80,000 in fees for his services.

### a. *The Auction Did Not Satisfy § 15 Of The LLC Agreement Or The Duty of Loyalty*

██ Despite Gatz's repeated efforts to convince me otherwise, I believe the Auction process used by Gatz was a bad faith sham. The process used was so far short of minimally responsible as to render Gatz's continued defense of it frivolous and burdensome. At an earlier preliminary injunction hearing, I made a probabilistic determination to that effect, following the procedural rubric for such a motion, and encouraged Gatz to engage in a bona fide marketing effort.[152] He and his counsel apparently did not view those findings and guidance as sound. I adhere to my earlier view, and the trial record clearly demonstrated that this sales process was one that no rational person acting in good faith could perceive as adequate. The Auction process was not a good faith effort to generate bids at a good price for Peconic Bay. Rather, the sham Auction was the culmination of Gatz's bad faith efforts to squeeze out the Minority Members. By failing for years to cause Peconic Bay to explore its market alternatives, Gatz manufactured a situation of distress to allow himself to purchase Peconic Bay at a fire sale price at a distress sale. I come to the conclusion that the Auction process was a sham for the following reasons.

First, the decision to auction Peconic Bay rather than engage a broker with a specialized knowledge of the golf course industry was telling, in a bad way. There was no need to create the appearance of a distress sale, in the difficult economic climate of 2009, when there was no economic exigency to do so. The cash cushion that Peconic Bay had allowed the time to properly market the Course, based on good materials, to a targeted list of potential buyers with demonstrated interest in the golf industry. This would have involved employing an experienced and credible broker or financial advisor, rather than a young employee of a bankruptcy sales house like Richard Maltz. Among the first targets for such an outreach would have been RDC. In making an appropriate decision for Peconic Bay, Gatz had to consider what was best for the entity, not himself. With money to pay the bills for three years, Peconic Bay's interest was clearly best served by a real market check and consideration of all strategic alternatives. Only Gatz himself was served by a bankruptcy-like sale process, which is what he commissioned.

Gatz justifies his decision to pursue the Auction based on the proposition that Peconic Bay's most valuable asset was its dwindling above-market rent payments from American Golf, and thus time was of the essence in getting it to market. I find this rationale unconvincing and litigation driven.[153] For the right strategic buyer, Peconic Bay could have been a long-term investment in a golf course located in a favorable demographic area, and at what could have been a fairly low cost.

---

152. *Auriga Capital Corp. v. Gatz Props., LLC,* C.A. 4390, at 82–83 (Sept. 18, 2009) (TRANSCRIPT).

153. In response to litigation filed by Auriga to enjoin the Auction, Gatz re-engaged Hirsh in May 2009 for his opinion on the advisability of the Auction. Hirsh's only conclusion was that an auction would be the most "efficient" way to sell Peconic Bay "quickly"; he never opined on the fairness of its terms, the marketing process, or on the resulting price. JX–101 (Expert Report of Laurence A. Hirsh (May 16.2011)) at PBG000274. Notably, Hirsh also had a strong golf course brokerage business. Gatz did not choose to hire Hirsh as a broker to sell Peconic Bay.

Second, even in the context of an auction approach, the indifference and unprofessionalism of the marketing effort is patent. No actions were taken to elicit real interest among credible players in the industry before the Auction. Maltz did not contact golf course owners, operators or management companies individually to advertise the Auction. Gatz's failure to inform Maltz about Galvin of RDC is particularly revealing. If Gatz was a willing seller, why would he not tell his auctioneer to contact someone who had expressed real interest in the Company only a year earlier? This failure, in addition to (1) the rushed marketing campaign that involved no serious effort to target the appropriate audience; (2) the "as is" due diligence materials that downplayed the value of Peconic Bay and revealed Gatz's intention to bid in the Auction; and (3) the Terms of Sale that made clear that Gatz could withdraw Peconic Bay from the Auction before bidding began, lead me to conclude that the Auction was not a process that anyone acting with minimal competency and in good faith would have used to obtain fair value for Peconic Bay.[154]

Gatz has argued throughout this litigation that Peconic Bay was worth less than its debt and thus any surplus over zero was a fair price, but I cannot accept this as true based on the record before me. Gatz himself is responsible for this evidentiary doubt. He fended off RDC, gave incomplete information to Hirsh, and did not promote a fair Auction process. Thus, I do not view the Auction process as gener-

---

154. In his briefing, Gatz advances the argument that he is protected from liability under 6 *Del. C.* § 18–406 for his reliance on Maltz and Hirsh in deciding whether to pursue the Auction. 6 *Del. C.* § 18–406 provides, in relevant part, that a "manager ... of a limited liability company shall be fully protected in *relying in good faith* upon ... information, opinions, reports or statements presented by ... any other person as to matters the ... manager ... reasonably believes are within such other person's professional or expert competence." (emphasis added). I cannot find that Gatz in good faith relied on either Maltz or Hirsh in his decisions related to the Auction. First, Hirsh was re-engaged in 2009, *after* the decision to auction Peconic Bay was made, and during pending litigation between Auriga and Gatz. Hirsh did not opine on the fairness of the Auction, and he was not asked to be involved in decisions related to how the Auction should be structured and marketed to ensure that Peconic Bay sold for its maximum value. I am also troubled that Hirsh took no offense when learning that Gatz had failed to provide him with material information relevant to his appraisal work, thus displaying the blinkered results-oriented, client-directed focus that generates skepticism about hired experts. Second, as to Maltz, I cannot find that Gatz in good faith relied on Maltz's "expert" advice. The most important reason is obvious. A fiduciary cannot select an unqualified advisor instead of a qualified one—as Gatz knowingly did—and then claim he was guided by his expert sherpa. *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del.Ch.2011) (noting that directors may successfully invoke the analogous protections of 8 *Del. C.* § 141(e) when they have selected "qualified advisors chosen with reasonable care."). Gatz and his counsel chose a jejune scion of a distress sale shop to conduct a market check for a unique asset. That Maltz did very little work for a nice sum of $80,000 would have been obvious to Gatz had he been acting with fidelity. Maltz did not keep records of important details and could not remember key events—such as who asked for the due diligence package or whether he reached out to any golf course owners or operators. Moreover, Gatz's claim of "reliance" is undercut by his and his counsel's full involvement in the development and approval of the marketing plan and the Terms of Sale. Gatz and his legal advisors—who helped shape his aggressive squeeze-out strategy—were pleased to have Peconic Bay sold as if bankruptcy was imminent, when it was not. Thus, for these reasons, Gatz is not entitled to claim protection under § 18–406 of the LLC Act. Bay sold as if bankruptcy was imminent, when it was not. Thus, for these reasons, Gatz is not entitled to claim protection under § 18–406 of the LLC Act.

ating a price indicative of what Peconic Bay would fetch in a true arms-length negotiation.[155] Rather, the evidence suggests that Peconic Bay was worth more than what Gatz paid. Gatz was not motivated to bid his best price because he knew that he was the only bidder before he finalized his offer, and he admitted at trial that he was willing to bid more if a third party had shown up. Gatz's incentive to top any third-party bid to unlock the value of his family's land would have pushed up the price of a fully negotiated deal. The fact that we do not have concrete evidence of what a fully negotiated third-party deal would have produced is Gatz's own fault, and such ambiguities are construed against the self-conflicted fiduciary who created them.[156]

Thus, for all these reasons, I conclude that Gatz breached his fiduciary duty of loyalty and his fiduciary duty of care by: (1) his bad faith and grossly negligent refusal to explore any strategic alternatives for Peconic Bay from the period 2004–2005 forward when he knew that American Golf would terminate its lease; (2) his bad faith refusal to consider RDC's interest in a purchase of Peconic Bay or a forward lease; (3) his bad faith conduct in presenting the Minority Members with misleading information about RDC's inter-

est and his own conduct in connection with his buyout offers in 2008; and (4) his bad faith and grossly negligent conduct in running a sham Auction process that delivered Peconic Bay to himself for $50,000. The results of this conduct left the Gatz family with fee simple ownership of the Property again, a Property that had been improved by millions of dollars of investments and now contained a clubhouse and first-class golf course. The Minority Members got $20,985.

Despite this, Gatz argues that he and his fellow defendant should not be held liable because even if they breached their fiduciary duties, they did not cause any economic harm because Peconic Bay was insolvent as of the time of the Auction.

I discuss that defense next in determining the appropriate remedy to award.

## V. Damages

### A. What Are The Damages That Gatz Owes?

 By the time of his post-trial briefs, Gatz's defense was really one based on minimizing the damages he would owe. That defense melds with his defense based on § 15 of the LLC Agreement, which is that regardless of his misconduct, Gatz Properties in fact paid a fair price for

---

155. *See Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 2335353, at *8 (Del. Ch. Sept. 20, 2005) (in a fiduciary duty action against a self-interested LLC manager, where the manager failed to conduct an adequate market test concerning the challenged transaction, the court noted that even though "[t]he [price] results may accurately reflect the market, ... the lack of coordination and process ... tends to undermine the results."); *Neal v. Alabama By—Prods. Corp.*, 1990 WL 109243, at *11 (Del.Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del.1991) ("If corporate fiduciaries engage in self-dealing and fix the merger price by procedures not calculated to yield a fair price, these facts should, and will, be considered in assessing the credibility of [their] valuation contentions.").

156. *See Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del.Ch. Oct. 29, 1993) ("'[O]nce a breach of [fiduciary] duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer.") (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (3d Cir.1985)); *see also William Penn P'ship v. Saliba*, 13 A.3d 749, 757–58 (Del. 2011) (conflicted LLC managers did not meet their burden of showing fair price, even when they had sold the LLC's asset at a premium to its appraisal price, because their "manipulation of the sales process denied the [other LLC members] the benefit of knowing the price a fair bidding process might have brought.").

Peconic Bay at the Auction and thus complied with its core mandate that Affiliate Agreements be entered into on "arms-length" terms and conditions.[157]

In support of that argument, Gatz points to testimony of Carr of Auriga. In that testimony, which was in response to questions from the court itself, Carr admitted that he considered bidding at the Auction, but did not because he could not come up with a model predicting positive returns high enough to meet his personal requirements.[158] Gatz also notes that Galvin did not bid at the Auction on behalf of RDC even though he was aware that it was going on, despite the lack of any outreach to him by Maltz or by Gatz.

Gatz also points to the reality that American Golf had never earned revenues at the Course that would allow it operate profitably and pay both the debt service on the Note and the Ground Lease Rent to Gatz Properties. Gatz also notes that American Golf's failures had left the Course in a compromised condition, and that the decline in the economy had hurt the golf industry in general, a factor injurious to Peconic Bay's value. He sums it all up as a situation where an idea just did not pan out. That is, Peconic Bay was a well-intentioned idea, but the economics just did not work in an American economy that was weak and where the golf industry was contracting.

For the following reasons, I do not reach the same conclusion that Gatz does about whether he should suffer a damages award.

First of all, even assuming that the date of the Auction is the right measuring rod, which I do not think it is, Gatz's contention that the Property had no positive value is not convincing. The fact that Carr would not stake his credibility with investors on the line by funding a full purchase of Peconic Bay after having had the investors he procured receive no return of capital for ten years is not one that can be given much weight. None of the Minority Members was duty-bound to invest and Carr and Auriga are not golf course operators. Furthermore, the fact that Galvin of RDC did not bid was understandable based on the unfair Auction rules and the prior treatment he had received at Gatz's hands. Galvin would have been sensible to have viewed the Auction as a ruse and not a fair chance for RDC to actually come away with Peconic Bay. RDC's failure to bid thus does not persuade me that it could not have justified a bid above the debt owed by Peconic Bay.

Second, even as of the date of the Auction, the fundamentals of Peconic Bay were such as to make me conclude that an offer above the debt would have been economically justifiable. The Course is a first-rate one, in a community that is an attractive one in which to run a Golf Course profitably, and the lease on it held by Peconic Bay ran until 2038. The Minority Members' presented a discounted cash flow analysis showing a value of Peconic Bay as of the date of the Auction of approximately $8.9 million.[159] Although

157. JX–2 § 15.

158. Specifically, Carr testified that his own models showed positive returns of "10[%] or maybe lower," but that he needed returns "in the 20s, if not higher" to justify the additional investment. Tr. 57–58 (Carr). As Gatz points out, Carr also testified that by the time of the Auction, he could not say it was likely that "the best golf investment banker in the world" could have found a buyer to bid an amount that would satisfy Peconic Bay's debt and produce a surplus for the Minority Members. See id. at 68–69 (Carr) ("Q. [the court] [Y]ou have no reason to believe that the best banker in the world could have done anything ... A. I wouldn't bet on it.").

159. JX–100 (Expert Report of Holtz Rubenstein Reminick (May 16, 2011)) at Ex. 5A.

that analysis shows a robust increase in rounds at the Course and uses a relatively low discount rate of 10.57%, that analysis is not an unreasonable one and incorporates a substantial capital investment in the Course and its facilities, the kind of investment that would attract back golfers. Gatz himself concedes that the results under American Golf were depressed by its own inadequate maintenance and management, factors which discouraged golfers from being repeat players. The attempts of Gatz's counsel at trial to undermine the Minority Members' DCF analysis were weak. Although I do not embrace the $8.9 million figure as a firm basis for a damages award because of its optimistic bias, it buttresses the reasonableness of the much lower value necessary to support the remedy I do implement because it illustrates to my satisfaction that, even under less sunny assumptions, Peconic Bay had value well in excess of its debt. Furthermore, the analysis does not even take into account the cash in Peconic Bay's coffers as of the Auction and is conservative in that way. I therefore find the Minority Members' DCF analysis to be a useful indicator of value if used in a prudent way.

Third, one cannot ignore Gatz's own behavior as of the time of the Auction. He was still only a buyer and not a seller. And after the Auction, he has continued to run the Course and apparently managed to service the debt and apparently intends to continue in the golf course business.

Most important, however, is this factor. Gatz himself is responsible for the evidentiary uncertainty caused by his own disloyalty. It was his own selfishly motivated acts of mismanagement that led to the distress sale.[160]

If he had acted properly, a liquidity event or some other sensible strategic alternative to the expiring American Golf Sublease would have been undertaken in 2007, when Galvin of RDC came on the scene. Gatz was the one who put Peconic Bay in a position of relative economic weakness by allowing the time on the Sublease to lapse and then choosing to put Peconic Bay on the auction block, and even then he chose an unduly rushed and compromised marketing process when there was time to do a professionally competent job. Given his own breaches of loyalty, the attendant uncertainties cut against Gatz, not against the victims of his infidelity.[161]

Had Gatz dealt with Galvin with integrity in 2007, it seems probable that Peconic Bay could have been sold in a way that generated to the Minority Members a full return of their invested capital ($725,000)

160. *See William Penn*, 13 A.3d at 758 (construing evidentiary uncertainty on the issue of fairness against the defendants where their breaches of their fiduciary duty of loyalty "prevented a fair and open process" and thus their "self interest in the transaction and their domination of the sales process tainted the entire transaction."); *Gentile v. Rossette*, 2010 WL 2171613, at *11 (Del.Ch. May 28, 2010) (holding that uncertainties in determining the fair value of a company "may cut against the fiduciary who has not faithfully discharged his duties.") (citing *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the pre-

cise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.")).

161. *See Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 466 (Del.Ch.2011) (citation omitted); *Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995, at *50 (Del.Ch. July 12, 2010); *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del.Ch. Oct. 29, 1993); *see also Harmon v. Lewis*, 2010 WL 2682514, at *2 n. 4 (Del. Ch. June 30, 2010); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 12.10[b][3] at 12–118 (2009).

plus a 10% aggregate return ($72,500). Why? For starters, Gatz rejected Galvin's interest in discussing a sale at a price "north of $6 million."[162] Galvin explained in a credible way—which is buttressed by the more current Minority Members' damages report—why a sale price in that range was justifiable given Peconic Bay's circumstances.[163] Gatz and his family validate the conclusion that a sale of Peconic Bay in 2007 at fair value would have been at a price higher than $6 million. Remember that he himself told the Minority Members on January 14, 2008 that his family "[was not] interested in selling [Peconic Bay's] assets at $6 million."[164]

Gatz, of course, had no duty to sell his interests. But the fact that he was not a seller does not mean that he had a free license to mismanage Peconic Bay so as to deliver it to himself for an unfair price.[165] If he wished to buy the whole entity, he had to do so at a fair price.[166] The evidence is clear that if Gatz wanted to buy Peconic Bay in 2007 when he should have been pursuing options for Peconic Bay in light of American Golf's likely termination, he would have to pay a price exceeding $6 million. Indeed, Gatz himself offered the Minority Members a deal at $5.6 million in that time frame, claiming it was equal to a deal more than $6 million due to the lack of closing costs or prepayment penalties associated his offer. Gatz never tested what RDC would actually pay, because he refused to give RDC due diligence or proceed in the motivated way a good faith fiduciary would have.

With the context that a market test would have provided, Gatz and his family would have faced an incentive to pay a price that would restore to them the fee simple ownership of the Property they desired to achieve. That would have pushed them higher in bidding, instead of in the southward direction he pushed things by fending off RDC and giving the Minority Members misleading information.

---

162. JX–170 at RDC000018.

163. At trial, Galvin explained that RDC had a low rate of return requirement, and he could have justified paying $6 million to $8 million for Peconic Bay's leasehold, assuming gross revenue projections of $4 million and net operating income projections of $600,000. *See* Tr. 208 (Galvin–Cross) ("If I bought [the leasehold] for 6 million, [and] I made 600,000 [in net operating income][,] ... it's a 10 percent return for me right off the bat. And then I pay 5 percent of my gross revenues [as Ground Lease Rent to Gatz Properties] ....that deal works for me. It works at 7 million. It works at 8 million. It's a good deal.").

164. JX–50.

165. *See Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1335 (Del.Ch. 1987) (majority stockholder seeking to "cash out" the minority stockholders "was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price."); *see also Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del.1996) (controlling stockholders' veto power over transactions did not eliminate their fiduciary duty of loyalty); *Freedman v. Rest. Assocs. Indus., Inc.*, 1990 WL 135923, at *6 (Del.Ch. Sept. 21, 1990) (Allen, C.) ("Occasionally ... a director's interests as a shareholder conflict with the company's interests. When such a conflict arises, the director must ignore her personal interests as a shareholder and attend to the corporation's interests.").

166. *In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *7 (Del.Ch. June 7, 1990) (Allen, C.) ("It is not sufficient for such directors [on a special committee] to achieve the best price that a fiduciary will pay if that price is not a fair price. Nor is sufficient to get a price that falls within a range of 'fair values' somehow defined, if the fiduciary (or another) would pay more. The fiduciary's best price may not be fair and the fiduciaries' position may preclude the emerge of alternative transactions at a higher price.").

In view of the persistent and serious nature of Gatz's breaches, and in view of his own 2008 claim that he was offering a deal that would have returned to the Minority Members their full initial capital contribution, I conclude that a remedy that awards the Minority Members their full capital contribution of $725,000 plus $72,500, is the equitable result.[167] This is slightly less than the amount that would have been produced by a deal in 2007 of $6.5 million.[168] Taking into account the $20,985 that the Minority Members received through the Auction, I arrive at a remedy of $776,515.[169] This is a modest remedy and the record could support a higher one.[170] As another measure of conservatism, I assume that in negotiations to get a deal at this level, the eventual buyer would have negotiated to retain the right to the remaining lease payments from

**167.** Damages resulting from a breach of the fiduciary duty of loyalty are liberally calculated. *Thorpe*, 676 A.2d at 444–45. And, although a damage award cannot be based on "speculation" or "conjecture," *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del.Ch. Nov. 16, 2005) (citation omitted), as long as there is a responsible basis for an estimate of damages, "mathematical certainty" is not required. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del.Ch.1999), *aff'd*, 766 A.2d 437 (Del.2000).

**168.** The Minority Members' damages report indicates that a deal at $6.5 million, modeled off of Galvin's letters of intent to acquire the Peconic Bay leasehold, would have produced proceeds to the Minority Members of $804,475, which would amount to a full return of the Minority Members' capital contribution plus $79,475 in surplus.

The reasonableness of assuming a deal at $6.5 million is supported by the incentives Gatz had. If it was true that Gatz could match RDC and deliver cash to the Minority Members at a lower deal price by avoiding certain costs—such as closing costs and prepayment penalties on the Note—as his $5.6 million offer suggested, Gatz could have offered $6.5 million and delivered this level of cash to the Minority Members himself. On this point, the Minority Members' argument for a "premium" based on Gatz's incentives has been fully considered by me. I take it into account by assuming a deal at the level I do, and by assuming that Gatz's own desire to buy would have pushed RDC or him to pay a good deal north of $6 million.

Finally, I note one minor quibble. It may be that the Minority Members' damages expert, Philip Kanyuk, did not strictly follow the requirements of the distribution waterfall set forth by § 11(b)(ii) of the LLC Agreement in the event of a "Capital Transaction" or a "Liquidation." Specifically, the terms of § 11(b)(ii) appear to call for a return of both the Class B and the Class A Members' capital accounts before the cash remainder is distributed pro-rata to all members. It appears that Kanyuk skipped over the steps of the waterfall that relate to the capital account balances of the Class B and Class A Members, and thus the damage award might be off by some tens of thousands from an award calculated under a strict adherence to the terms of the § 11(b)(ii) waterfall. But, given Gatz's failure to challenge this aspect of Kanyuk's analysis or the Minority Members' contention that none of them received cash distributions over the period of their investment in Peconic Bay, I hew to Kanyuk's analysis rather than improvise.

**169.** $725,000 + $72,500–$20,985 = $776,515.

**170.** In shaping my remedy, I am not immune to the reality that there is an argument that the Minority Members should have simply taken Gatz's supposed offer of $5.6 million in January 2008. But that offer did not come with full disclosure; it came on misleading disclosures and at a time when Gatz was not coming clean with the Minority Members about fending off RDC. Given Gatz's conduct, it is also dubious whether he ever meant to pay anything close to a full return of capital given his low-ball 25 cents on invested capital offer that came only eight months later. Had he acted as a fiduciary should have, Gatz could have come to a resolution with the Minority Members in 2007 that eliminated the need for litigation and left everyone with a liveable result. By his own lack of candor and fidelity, Gatz ended up enmeshing himself and the Minority Members in years of protracted litigation, to the detriment of their mental and economic health.

American Golf to help establish itself. By this assumption, I also take into account that issues in due diligence and negotiation could have arisen between Peconic Bay and Gatz, even if Gatz had acted faithfully, over such things as the lease term held by Peconic Bay and the reasons for weak performance by the Course.

Thus, I award $776,515 as of January 1, 2008, with pre-judgment interest at the statutory rate, compounded monthly, until the date of the final judgment.[171] This award hardly results in a Powerball win for the Minority Members, with an annualized rate of return of less than 1%. They invested their capital in 1998, received no distributions during the life of Peconic Bay, and were allocated capital gains for tax purposes. By contrast, Gatz and his family received approximately $1 million in Ground Lease Rent and gained back fee simple ownership of a Property in which millions of dollars of valuable capital improvements had been made, and substantial cash to help fund the mortgage and additional operational and capital costs.

### B. A Partial Shifting Of Fees Is Warranted

Under the American Rule, each party is ordinarily responsible for its own litigation expenses.[172] But, this court has discretion to shift attorneys' fees and costs when a party to the litigation has acted in bad faith.[173] The bad faith exception is not "lightly" invoked.[174] Rather, the party seeking fee shifting must show by "clear evidence" that the party from whom fees are sought has acted in subjective bad faith.[175] There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct

171. In arriving at this remedy, I have properly taken into account the Minority Members' contract claims premised on Gatz's failure to distribute Available Cash as defined by § 11 of the LLC Agreement. These claims are based on the notion that Peconic Bay did not need its cash on hand to address its immediate needs and that Gatz selfishly husbanded the cash to give himself and his family, and not Peconic Bay, a cushion to pay the debt on the Property. That is, the Minority Members say that Gatz never intended the cash to benefit Peconic Bay and its investors but only the Gatz family. This claim is notably not supported by any evidence that Gatz misappropriated funds. Although there are stray references to expenditures for automobiles, the Minority Members do not prove that Gatz misused funds other than by allegedly husbanding cash for the payment of debt and not returning it to investors. Furthermore, a genuinely faithful fiduciary could have husbanded cash for the proper purpose of making sure that Peconic Bay met its core legal obligations, including paying its debtholders. Most important, the damage award I fashion assumes a deal in the range of $6.5 million as of January 1, 2008 that allowed the Minority Members to benefit from the cash then on hand. Thus, to award more would risk a double recovery. My award also accounts for some of the important issues that would have had to have been addressed in finalizing a deal with RDC. I do not think it is realistic to assume that a buyer as of 2007 would have not acquired the remaining three years of lease payments (or have worked out on its own terms with American Golf on early withdrawal) such that this stream of cash would have been available to distribute to the Minority Members.

The problem here is that Gatz was not a faithful fiduciary, not his husbanding of cash considered in isolation from his broader, improper motivations. But by implementing a remedy tied to what Peconic Bay was worth in 2007, which I do, I rectify in a responsible way all of his serious breaches of duties.

172. Tandycrafts, Inc. v. Initio Partners, 562 A.2d 1162, 1164 (1989).

173. Barrows v. Bowen, 1994 WL 514868, at *1 (Del.Ch. Sept. 7, 1994).

174. Nagy v. Bistricer, 770 A.2d 43, 64 (Del.Ch. 2000).

175. Arbitrium (Cayman Is.) Handels AG v. Johnston, 705 A.2d 225, 232 (Del.Ch.1997), aff'd, 720 A.2d 542 (Del.1998).

warrants fee shifting under the bad faith exception is a fact-intensive inquiry.[176]

The record is regrettably replete with behavior by Gatz and his counsel that made this case unduly expensive for the Minority Members to pursue. Rather than focus on only bona fide arguments, Gatz and his counsel simply splattered the record with a series of legally and factually implausible assertions. These range from arguments that he owed no fiduciary duties to the Minority Members;[177] to arguments that he acted in reliance on the advice of advisors whose advice he had not even sought on the topic at hand or whose advice he would not disclose fully;[178] to repeating frivolous arguments about the good faith and competent nature of an obviously inadequate and substandard sales process;[179] and to suggesting in arguments to the court that he was a willing seller in the Auction when he later confessed at trial that he and his family never intended to sell.[180] Gatz and his counsel also created evidentiary uncertainty by leaving to Gatz himself the primary role of collecting responsive documents,[181] and having had Gatz, who appears not to have been adequately counseled by his legal advisors, delete relevant documents while litigation was either pending or highly likely.[182] The constant presentation of arguments that were not plausible resulted in excess work by the court and, most important, by counsel for the Minority Members. Sadly, my sense is that this was part of Gatz's strategy, which was to exhaust the Minority Members and hope they would settle on the cheap because he would make litigation not a cost-effective option. In cases of serious loyalty breaches, such as here, equity demands that the remedy take the reality of litigation costs into account as part of the overall remedy, lest the plaintiffs be left with a merely symbolic remedy.[183]

---

176. *See Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del.Ch.2005).

177. *E.g.*, Defs. Ans. Br. in Opp'n to P. Mot. for Prelim. Injunction, at 20–22 (arguing that the LLC Agreement "unambiguously" waived all fiduciary duties).

178. *E.g.*, Defs. Op. Pre–Tr. Br. at 23–25 (arguing that Gatz relied on Maltz and Hirsh); *id.* at 23 (suggesting that Gatz relied on counsel); Defs. Op. Post–Tr. at 4 (arguing that Gatz "sought advice from professionals in the ... legal fields" yet never waiving the attorney-client privilege).

179. *E.g.*, Defs. Op. Pre–Tr. Br. at 27 (arguing that Auction process was fair).

180. *Compare Auriga Capital Corp. v. Gatz Props., LLC*, C.A. 4390 (Del. Ch. Feb. 27, 2009) (TRANSCRIPT) ("Q. [the court] If the Gatz interests—have they committed to sell to the highest bidder? ... Are they reserving—are they going to—are they reserving any right to use their voting power to interfere with a third parties' purchase of the property? A. [Gatz's counsel] The answer is no, Your Honor. Q. [the court] They are committed to that? A. Yes ...."), *with* Tr. 566 (Gatz—Cross) (testifying that his family was not interested in selling), *and id.* at 557 (Gatz—Cross) ("Q. [the court] You weren't interested in selling, but you were interested in buying? A. Yes, I was."), *and id.* at 621 (Gatz) ("I'm not saying [another bidder] would have won. I may have bid higher.").

181. *Id.* at 24 ("Q. [the court] Who did the responsiveness review? ... Did you get the hard drives and do them yourself or did you rely on Mr. Gatz? A. [Gatz's counsel] I relied mainly on Mr. Gatz.").

182. *Id.* at 22–23 (where Gatz counsel represented to the court that they "just did not have" the "vast majority" of the RDC emails, and that they might have been "deleted."); *id.* at 528 (Gatz—Cross) ("I'm not saying that I did, but there is a possibility that after six, eight months, I may have gone through and actually deleted our conversations with Mr. Galvin.").

183. This court departs from the American Rule and may shift fees where the "underlying (prelitigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages." *Arbitrium (Cayman Is.) Handels AG v. John-*

For these reasons, among others, I find that Gatz's conduct both before and during this litigation warrants an award of one-half of the Minority Members' reasonable attorneys' fees and costs.[184] I do not award full fee shifting because the Minority Members' own litigation efforts have in some ways been less than ideal in terms of timeliness or prudent focus, and I have not embraced their more aggressive remedial suggestions.

## VI. Conclusion

For all these reasons, I find for the Minority Members and will enter a final judgment for them. The Minority Members shall submit a conforming final judgment, upon notice as to form, within 20 days. That final judgment shall also dismiss with prejudice Gatz's premature claim for indemnity, because, among other reasons, his behavior disqualifies him from receiving indemnification.

---

ston, 705 A.2d 225, 231 (Del.Ch.1997), aff'd, 720 A.2d 542 (Del.1998). For prior analogous cases shifting fees based on the defendant's egregious breach of his fiduciary duty of loyalty, see *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del.2011) (affirming the trial court's decision to award the plaintiffs their full attorneys' fees based on the determination that it would be "unfair and inequitable for [the plaintiffs] to shoulder the costs of litigation arising out of improper pre-litigation conduct attributable to the [defendants] that amounted to a violation of their fiduciary duties," and noting that this decision was "supported by Delaware law in order to discourage outright acts of disloyalty by fiduciaries."); *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del.Ch. May 11, 2001) (in awarding the plaintiff attorneys' fees based on the defendants' breach of their fiduciary duty of loyalty, the court reasoned thusly: "While awarding damages to the plaintiff equal to the fees and expenses spent in prosecuting this action will not make the plaintiff completely whole and will leave some harm unanswered, this Court, exercising the discretion given it, determined that damages, as measured by attorneys' fees and expenses spent to address the defendants' conduct, is an appropriate remedy for this egregious breach of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 125 (Del.Ch.1999) (awarding attorneys' fees where the defendant's "intentional, bad faith misconduct prior to the litigation was 'totally unjustified,' and [rose] to the level of egregiousness necessary to justify such an award.") (citation omitted).

184. The Minority Members' counsel shall submit an affidavit setting forth this amount to Gatz within five days of this decision. Unless Gatz's counsel fully produces their own billing records in full in support of an argument that the Minority Members' bills are too high, I shall consider the Minority Members' amount sought to be reasonable. In objecting to the amount of the fee, Gatz and his counsel should remember that it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it.